THE CHASE NATIONAL BANK OF THE CITY OF NEW YORK, as Corporate Trustee under Trust Mortgage, Dated January 1, 1928, Made by 10 East Fortieth Street Corporation Securing an Issue of $5,500,000 Principal Amount of First Mortgage Six Per Cent Gold Bond Certificates, Plaintiff, *v.* 10 EAST FORTIETH STREET CORPORATION, Appellant, Impleaded with EDGAR N. GREENE-BAUM and Others, Defendants.

LEE S. BUCKINGHAM and Others, as a Committee, Intervenors, Respondents.

First Department, June 2, 1933.

*Carl E. Newton* of counsel [*Joseph M. Hartfield* with him on the brief; *White & Case,* attorneys], for the appellant.

*Mark Hyman* of counsel [*Louis G. Bernstein* with him on the brief; *Rabenold & Scribner,* attorneys], for the respondents.

*William D. Carr* of counsel [*Beekman, Bogue & Clark,* attorneys], for James G. Blaine and others, as a committee, as *amici curiæ.*

MERRELL, J. The respondents are a minority committee formed on December 31, 1932, and on January 30, 1933, the respondents represented 142 bondholders owning $258,500 in bond certificates out of a total outstanding issue of $5,373,500. A majority committee, known as the Schlosser Committee, was organized on July 19, 1932. On November 30, 1932, the said majority committee announced a plan of reorganization of the defendant corporation, and on January 21, 1933, the said majority committee had on

deposit in its account $3,771,000 of bond certificates, or seventy per cent of the total bond issue. The majority or Schlosser Committee was formed by the bankers for the 10 East Fortieth Street Corporation who had originally sold the issue. Ten East Fortieth Street Corporation, the mortgagor, defaulted in answering in the action, and states in an affidavit that it has no meritorious defense. It is, therefore, necessary to reorganize the property since concededly there was no market for property of this type, and it would be impossible to obtain competitive bids on a sale under foreclosure. The minority committee, known as the Buckingham Committee, the respondents herein, protested against the Schlosser plan because it was purely a stockholders' reorganization, benefiting only a stockholding group, although the Schlosser Committee had pledged itself " to protect the bondholders against the old company, its stockholders or receivers."

The property at 10 East Fortieth street has always been and still is a very successful development. Even during the receivership its earnings have been over $360,000 a year net or nearly seven per cent upon the entire bond issue. It is alleged that this sound financial condition, however, was wrecked by the stockholders, who, directly before the receivership, deliberately withdrew for the benefit of their affiliated corporations the large sum of $268,657.81 from the earnings of the company and left unpaid, taxes, bond interest and amortization payments. The result of this was to force the acceleration of the maturity of the issue and the receivership. It is entirely plain that the act of the stockholders making this unauthorized withdrawal and causing default in the payment of taxes, bond interest and amortization payments was deliberate and premeditated for the plain purpose of forcing a foreclosure by the trustee of the mortgage securing the bonds. It is alleged that by doing this the stockholders were clearly planning to get the property back under a reorganization plan with the mortgage debt lightened and the diversions which they had made of the rents and income of the property condoned. For the purpose of checking this raid of the stockholders at the expense of the bondholders, and in the interest of the bondholders, application was made to intervene in the foreclosure action.

Concisely stated, the default in the interest, taxes and amortization payments was the direct result of the withdrawal by the stockholders in the year prior to the commencement of the foreclosure action, from the net rents of the property, the sum of $268,657.81, instead of using the said amount withdrawn from the rents in discharging taxes, interest and other payments. Of this amount, $207,600 was withdrawn between February 5 and July

19, 1932, after notice of default. Under the terms of the trust mortgage, the defendant had no right to withdraw any of the rents after notice of default. Allegedly the diversion of these large sums of money from the rents of the property was for the plain purpose of forcing the trustee to declare the principal of the bonds due and to foreclose the mortgage given to secure the same. The plain plan of the stockholders was to get the property back on reorganization with the mortgage debt lightened. It is claimed that throughout the entire period of default and during the six months of the receivership, the property earned more than its full interest, taxes and payments, as well as liberal operating cost, and that its present net earnings are over $360,000 per year, and the lowest estimate for the future is $275,000 net. From these figures it will appear plainly that the defendant corporation was on a firm financial basis, and even in times of depression was earning far more than enough to pay the interest on the bonds, taxes and amortization payments. Notwithstanding all this, under the reorganization plan attempted by the defendant and its bankers, it was contemplated that the bondholders should cut their principal in half and get only five per cent on the half or two and one-half per cent on the whole, or $134,375 a year, and that they should also get for the other half, non-cumulative preferred stock which could not possibly pay dividends for ten years, as $100,000 annually and depreciation were to be deducted from the earnings. It is alleged that the proposed plan also gave all the common stock and voting control to the former management, and it was planned that thirteen months' interest should be waived, and that the bondholders should waive any claim to the withdrawal of the $268,657.81, and that the new management should be given to the old group of stockholders under a management contract for five years at $15,000 per year net. A. B. Jones, formerly president of the corporation, was made receiver. Jones is also president of an affiliated corporation which owned all the stock of 10 East Fortieth Street Corporation, and is the president of this affiliated corporation which received the $268,657.81. Jones was the president and largest stockholder of the management corporation to which he as receiver tried to give a three per cent management contract for the property with its $660,000 annual gross rents. Jones was also president of the corporation which it was proposed to underwrite the Schlosser reorganization plan and to get the stock of the new corporation. An examination of the figures presented by respondents clearly indicate mismanagement by Jones of the defendant corporation. These figures are summarized in the respondents' brief at page 5 as follows:

" The trustee has on hand...................... $134,337 50
    Earnings July 21 /32 to Dec. 31 /32............. 221,393 75
    Estimated earnings to 6 /30 /33................ 258,000 00

    Total cash as of July 1, 1933.............. $613,731 25
  Deduct: defaulted tax compromise... $240,000
         May, 1933, taxes.......... 63,180
                               303,180 00

Net cash as of July 1, 1933, to be* absorbed in fore-
    closure and reorganization expenses.......... $310,551 25
  Rents withdrawn............................ 268,657 81

    What Jones cost........................ $579,209 06 "

_n addition, the proposed plan would cost the bondholders annually for the next ten years a considerable amount each year until the " preferred " stock could pay interest. The trust mortgage provides for the annual interest payments of $322,410. The Schlosser or majority committee plan proposes to pay $134,375, or an annual loss of $188,035, and for ten years at a total loss of $1,880,350. In a circular sent out by the minority committee now seeking to intervene on January 23, 1933, in attacking the plan proposed by the Schlosser Committee, the respondents stated as follows: " On January 7, 1932, the Receiver and Trustee had on hand $355,000 cash. The reorganization cannot be completed before the first of July. The property is earning net $30,000 a month, over expenses and taxes. By the first of July there should be $525,000 cash on hand. After providing for defaulted taxes and foreclosure and reorganization expenses, the new company should have over $200,000 cash on hand, with all taxes and expenses paid.

" Why, therefore, does the Schlosser Committee want to raise an additional $537,500? Why turn the property, together with all this money back to that same management, which in the six months before the Receivership withdrew $207,000 from the property?

" We say that the past management was not in the interest of the bondholders. What does the Schlosser Committee say? Their plan does not criticise but on the contrary rewards the past management; as follows:

" The past management get back the property freed of half of its mortgage debt.

" They get voting control of the new corporation.

" They retain the money withdrawn from the property.

" They get a management bonus of about $15,000 a year.

---

* " We say this, because the Schlosser Committee claims to need another $500,000 to complete the reorganization."

" All of this is countenanced and approved by the Schlosser Committee which originally announced its purpose to protect the bondholders against the old company and its stockholders and Receiver.

" It is time that the bondholders took their property into their own hands and did their own reorganizing."

It is entirely clear that the trustee is willing to co-operate for the purpose of forming a fair plan for the reorganization of the defendant corporation. The petition herein states, at paragraph 20, that " In and by the trust mortgage, the plaintiff trustee is expressly authorized as such trustee to become the purchaser at any foreclosure sale for the benefit of certificate holders." And in the prayer for relief the petitioners state " that, unless a fair plan shall be presented, the plaintiff trustee be authorized and directed to purchase at the foreclosure sale for the benefit of the certificate holders."

The affidavit of Samuel Brooks in behalf of the respondents, petitioners, Buckingham Committee, states that the power to purchase at the foreclosure sale is an effective remedy " to overcome an unfair plan and to prevent a sacrifice of bondholders' interests by a nominal bid at the foreclosure sale." In the foreclosure complaint the trustee bases the prayer upon this power to purchase, and in the trustee's brief at Special Term the trustee states: " The trustee would welcome a judicial expression of opinion as to its powers in this connection." It is entirely plain therefrom that the trustee is entirely willing that the petitioners should intervene and that the court should direct the trustee as to the manner in which its powers shall be exercised.

All sides seem to concede that upon foreclosure there may be no true competitive sale, but that the foreclosure proceedings are a step in readjusting the relative interests of creditors and stockholders. This requires the court's consideration of the fairness of the plan of reorganization offered by the Schlosser Committee, and that unless the court should intervene a fraud might be perpetrated. In paragraph 18 of the petition herein the petitioners state: " Your petitioners respectfully submit that the defendant corporation, together with Houston Property Corporation and corporations and individuals affiliated with them [the stockholding group], combined to divert the rents and payments from the mortgaged premises to themselves and to procure the sale of the mortgaged premises and the purchase thereof by themselves freed of at least one-half of the mortgage debt and for the purpose of hindering, delaying and defrauding such of the certificate holders as would decline to yield up one-half of their investment; all for the purpose of securing to said combination an increase of their share in the enterprise at the expense of the certificate holders."

In the case of a strict foreclosure whereby the equity of the mortgagor is entirely wiped out, a comparatively simple problem is presented. Prior to 1899 it seemed to be the general impression that mortgage bondholders could combine with the stockholders of the corporation and readjust the entire property to suit themselves, to the extinction of all intermediary claimants and even to the injury of the mortgage bondholders themselves. Then came the leading case of *Louisville Trust Co.* v. *Louisville, etc., Railway* (174 U. S. 674, the *Monon* case). This decision of the United States Supreme Court held that with the large amount of the property involved or for other reasons, sales in foreclosure could not be expected to bring real competitive bidding, and that in such cases the foreclosure action was only a step in a reorganization of the corporation, and that the transaction was as if the mortgagor had conveyed directly to the reorganization company in fraud of the rights of lien and of unsecured creditors. The court held that the foreclosure decree was no protection, but merely registered the will of a predetermined plan of reorganization. In that case, upon a petition to intervene, charging a combination to cut down creditors for the benefit of stockholders, the Supreme Court directed vacation of the foreclosure decree and prohibited the entry of a new decree until the rights of the creditors were recognized which had been overlooked and set aside by the reorganization plan. The Supreme Court, in that case, among other things, said (at p. 684): " This is based upon the familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors; *first of secured* and then of unsecured creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of *either class* of creditors comes within judicial denunciation." (Italics are the writer's.)

In *Farmers' Loan & Trust Co.* v. *N. Y. & Northern R. Co.* (150 N. Y. 410) the foreclosure of a mortgage was enjoined where the mortgage bonds were controlled by the New York Central, the principal stockholder, and its affiliated corporations and bankers; and where it was charged that the stockholders had planned to procure the property on reorganization freed of a part of its debts, and that as a means to this end it used the direction of traffic and the diversion of income from bond payments to permanent improvements, thus causing the defaults necessitating a foreclosure of the mortgage. The Court of Appeals in that case said (at p. 431): " It is a controlling maxim that a court of equity will not aid parties in the perpetration or consummation of a fraud, nor give any assistance whereby either of the parties connected with the

betrayal of a trust can derive any advantage therefrom. (*Farley* v. *St. Paul, Minneapolis & Manitoba Ry. Co.*, 4 McCrary, 138.) ' It is a sound principle, that he who prevents a thing being done shall not avail himself of the non-performance he has occasioned.' (*Fleming* v. *Gilbert*, 3 Johns. 528, 531; *United States* v. *Peck*, 102 U. S. 64; *Dolan* v. *Rodgers*, 149 N. Y. 491.)

" The principle of these authorities renders it quite obvious that a corporation, purchasing a majority of the stock of another competing one, cannot obtain control of its affairs, divert the income of its business, refuse business which would enable the defaulting company to pay its interest, and then institute an action in equity to enforce its obligations, for the avowed purpose of obtaining entire control of its property to the injury of the minority stockholders."

To the same effect is the holding of the Court of Appeals in *United Water Works Co.* v. *Omaha Water Co.* (164 N. Y. 41).

Until recent years foreclosures of trust mortgages were almost entirely brought in the Federal courts, and the State courts were not called upon to enforce the doctrine laid down by the United States Supreme Court in *Louisville Trust Co.* v. *Louisville, etc., Railway (supra)*. At the present time, however, there have been a large number of foreclosures of real estate trust mortgages, and the State courts are called upon to apply the principles and practices enunciated in the United States Supreme Court case. Indeed, it seems to us absurd for the appellants to urge, as they do in this case, that the State courts are incapable of doing the same equity as have the Federal courts. In the case of *DeBetz's Petition* (9 Abb. N. C. 246) a minority group of bondholders dissented from a plan of reorganization and intervened to oppose the expenses of the reorganization and to have their right to join the plan kept open until their dissent had been heard. The court allowed the intervention in that case, saying (at p. 252): " In no view which can be taken of the case as it has been now presented on behalf of these applicants, would the court be justified in denying the prayer of their petition. * * * As bondholders these persons are entitled to know what charges are to be made against the property incumbered for their security, and under the circumstances that can only be surely done by allowing them to become so far parties to the action as to enable them, by proper exceptions, investigations and proofs, to examine into the charges which they allege to have been improperly included in the accounts and the judgments."

In *Clinton Trust Co.* v. *142–144 Joralemon Street Corp.* (237 App. Div. 789), Mr. Justice Scudder, writing for the Appellate Division, Second Department, on March 10, 1933, stated: " The

way is not unblazed if it be thought that we are pioneering in a new field. In the Federal jurisdiction it has been comparatively common for courts to take cognizance of reorganization plans in foreclosure and other suits, and to withhold judgment or confirmation of a sale until some fair and open plan of reorganization was presented and substantially agreed upon; and it has been said: ' A court of equity's modes of relief are not fixed and rigid. It can mold its remedies to meet the conditions with which it has to deal.' (*Graselli Chemical Co.* v. *Ætna Explosives Co.*, 252 Fed. 456, 459.) "

To the same effect was the holding of Justice PROSKAUER in *Maas* v. *Sullivan* (124 Misc. 295; affd., 213 App. Div. 820). We think under these decisions it was the plain duty of the Special Term to permit the intervention of the so-called Buckingham Committee, and that the order so far as appealed from should be affirmed, with twenty dollars costs and disbursements to the intervening petitioners, respondents, against the defendant, appellant.

McAVOY, MARTIN and SHERMAN, JJ., concur; FINCH, P. J., dissents and votes for reversal and denial of the motion.

FINCH, P. J. (dissenting). The question involved in this appeal is whether a committee representing approximately twelve per cent of the bondholders should be allowed to intervene in an action brought by the corporate trustee to foreclose the trust mortgage under which the bonds were issued.

Intervention should not be permitted for the following reasons:

By the terms of the trust indenture under which the bonds in question were issued, it is expressly provided that every right of action, whether at law or in equity, is vested exclusively in the trustee. There is no claim upon the part of the petitioning bondholders for leave to intervene that the trustee is in any way delinquent in the performance of its duties as trustee, or that there is any bad faith on the part of the trustee, or that the interests of the bondholders will not be properly asserted through the trustee. The ground upon which leave to intervene is sought is that the default under the mortgage was brought about by certain stockholders in the expectation that upon a reorganization the stockholders would get the property back with the mortgage debt reduced. It is sought to litigate the relative merits of rival plans of reorganization to the end that the court should forbid the sale of the property to the highest bidder if the latter should advocate a plan of reorganization deemed by the court to be unfair.

All the foregoing matters are outside the scope of an action in foreclosure, which in this State is controlled by specific statutory provisions. Among these is the express requirement that the sale be made to the highest bidder (Civ. Prac. Act, § 986). The trustee

may not, in the absence of any claim of fraud upon its part, be deprived of the statutory right to have the property sold to the highest bidder and thus the maximum sum obtained for the bondholders.

Great reliance is placed by respondents upon the case of *Louisville Trust Co.* v. *Louisville, etc., Railway* (174 U. S. 674), which it is claimed revolutionized the rules as to intervention in foreclosure actions and authorizes the relief granted in the case at bar. In that case, however, it was charged that the plaintiff trustee was a party to a fraudulent scheme for defeating claims of unsecured creditors, to which end the foreclosure action was instituted. That case, therefore, worked no change in the established rule in cases where bondholders seek to intervene in foreclosure suits for the purpose of opposing a proposed plan of reorganization. This rule is clearly stated in *Palmer* v. *Bankers' Trust Co.* (12 F. [2d] 747), as follows: " One familiar class of cases in which intervention is frequently denied is corporate mortgage foreclosure cases. The general rule in such cases is that the trustee, being a party to the suit, represents all the bondholders, and that the latter will not be permitted to intervene unless a showing is made that the trustee is not *unexceptionable;* for example, that the trustee has or is representing a financial interest in the litigation opposed to that of the bondholders, that the trustee is conspiring with someone to bring about unfair results, and that the trustee is guilty of fraud or is not acting in good faith."

In the absence of any claim of fraud against the trustee in the case at bar, the contractual rights of the parties under the trust deed or mortgage are controlling. These, as before noted, vest in the trustee the exclusive right to maintain the action in foreclosure. (*Batchelder* v. *Council Grove Water Co.*, 131 N. Y. 42; *Greene* v. *New York United Hotels, Inc.*, 236 App. Div. 647.)

If bondholders deem themselves aggrieved by a particular plan of reorganization, full relief may be obtained in an action in equity brought directly for that purpose.

To permit the injection of such collateral issues in a foreclosure action where the right to a decree is not in issue, would directly violate clearly defined contractual rights, would complicate and delay the progress of the foreclosure action to an extent impossible to measure, and in addition possibly burden the property with greatly increased charges and expenses.

The order appealed from should be reversed and the motion denied.

Order so far as appealed from affirmed, with twenty dollars costs and disbursements to the intervening petitioners, respondents, against the appellant.