In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN. SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property and Rehabilitate the NEW YORK TITLE AND MORTGAGE COMPANY.*

Supreme Court, New York County, January 29, 1934.

*Edward Endelman* [*Max D. Steuer* of counsel], for the motion.

*Greenbaum, Wolff & Ernst* [*Morris L. Ernst* of counsel], for George S. Van Schaick, Superintendent of Insurance of the State of New York, as rehabilitator of New York Title and Mortgage Company, opposed.

FRANKENTHALER, J. The petitioners, owners of certificates issued by the New York Title and Mortgage Company, seek to enjoin the Superintendent of Insurance, as rehabilitator of that company, from making any payments to attorneys engaged in formulating corporate plans of reorganization for promulgation under the Schackno Act (Laws of 1933, chap. 745, as amd.). They assert that the Superintendent proposes to pay the expenses incurred by various attorneys in connection with the printing, mailing and promulgation of such plans, including the expense of forming corporations thereunder, and that such payments would violate subdivision 4 of section 6 of the act, which authorizes the Superintendent to pay for such expenses only if he himself promulgates the plan, and not if the promulgation is by the certificate holders.

In answer to these charges, the Superintendent declares that he has no intention of making payments for the printing and mailing

* Revd., 264 N. Y. 475.

of any plan " unless it is so promulgated by him, and in those cases the expenses to be paid will be limited to those provided for by the statute." He asserts that if a plan is promulgated by him the circumstance that " the preliminary work is done by lawyers representing certificate holders does not alter the situation," and that the statute, in such a case, authorizes him to pay the expenses of printing and mailing the plan. As to the claim that he contemplates paying the expenses of incorporation, the Superintendent states that the charge " is not true " and that no payments will be made, except by the corporation, out of corporate funds.

In view of the disclaimer by the Superintendent of any intention to make payments not authorized by the Schackno Act, the present application, in so far as it proceeds upon the theory that the proposed payments would violate that statute, must be denied.

The petitioners, however, make the additional and more serious contention that any payments by the Superintendent for the purpose of promulgating plans of reorganization under the Schackno Act are illegal and improper because the act itself is unconstitutional. Accordingly, they maintain that they are entitled to an order restraining the Superintendent from employing for that purpose funds which would otherwise be available to meet the guaranties held by the petitioners and others similarly situated. The question of the constitutionality of the Schackno Act is thus presented for decision.

The court is aware of the fact that the act has been upheld as constitutional in two Special Term decisions (*Schmaling* v. *Burling*, Special Term, Westchester Co., MORSCHAUSER, J., 151 Misc. 47; *Matter of Title & Mortgage Guarantee Company of Buffalo*, Special Term, Erie Co., HINKLEY, J., 149 id. 915.) Since those decisions were rendered, however, two opinions of higher courts have been handed down which have an important bearing upon the legal questions involved in determining the issue of constitutionality (*Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398; 54 U. S. R. 231; *Moses* v. *Guaranteed Mortgage Co.*, 239 App. Div. 703).* The reasoning of these cases, in the court's opinion, requires a determination contrary to that reached in *Schmaling* v. *Burling* and in *Matter of Title & Mortgage Guarantee Company of Buffalo* (*supra*). Moreover, in the last-mentioned case the court stated that the objections raised to the validity of the act " would undoubtedly be held fatal under ordinary conditions," but took the position that the existence of an emergency constrained the " trial court at least " to refrain from declaring the statute unconstitutional. In the light of the foregoing, the Special Term decisions previously referred to are not controlling here and do not

* Revd., 264 N. Y. 476.

preclude the court from determining the question of constitutionality *de novo*. The Superintendent of Insurance, however, suggests that the disposition of this motion be held in abeyance pending the determination of appeals to be taken to the Court of Appeals in *Moses* v. *Guaranteed Mortgage Co.* (*supra*) and in *Matter of Title & Mortgage Guarantee Company of Buffalo* (*supra*). Under ordinary circumstances the court might be inclined to comply with a suggestion of this character, but in the instant case there appears to be an urgent need that the court give immediate expression to any doubts it entertains as to the constitutionality of the Schackno Act. The Legislature is now in session. If some of the court's views as to weaknesses and defects in the act appear to the Legislature to be well founded, that body may avail itself of the opportunity thus presented to amend and strengthen the act during the present session and perhaps render it immune to attack on constitutional grounds. Waiting for the presentation of the question to the Court of Appeals and for the decision of that court may result in the loss of this opportunity. Moreover, great prejudice may come to the petitioners and others similarly situated if funds which should ultimately be applied to pay their claims are expended by the Superintendent for a period of several months for illegal and unauthorized purposes. Furthermore, if the act is unconstitutional, it is preferable that a decision to that effect be handed down immediately, rather than that months of effort should be expended in securing the adoption of plans of reorganization thereunder only to have such efforts rendered futile by a determination of an appellate court that the act is invalid. The plight of those holding certificates of mortgage guaranty companies is such that every effort should be made to obtain a speedy clarification of their rights under existing laws and the prompt enactment of any new legislation which may be necessary or desirable to relieve the unfortunate situation which now exists.

In section 1 of the Schackno Act the Legislature declares the existence of a public emergency " requiring the provisions of this act," arising out of the following circumstances: (1) Guaranteed mortgage certificates amounting to about one billion dollars are outstanding held by hundreds of thousands of investors, a large percentage of whom are persons of only moderate means; (2) rental values have declined so sharply, " as a result of the existing disruption of economic and financial processes," that it is impossible in many cases for owners of real estate to meet their obligations on mortgages against which guaranteed certificates have been issued and numerous defaults have occurred and widespread additional defaults are likely to occur; (3) immediate liquidation of a sub-

stantial number of such defaulted mortgages would so demoralize the general real estate market that the amounts realized might be substantially less than their face amounts and substantially less than would be realized if the liquidation were conducted "in an orderly manner over a reasonable period of time;" (4) since the guaranty companies are obligated to pay the deficiencies resulting from the liquidation of the mortgages, their forced liquidation would result in such unprecedented demands on the resources of the companies that said resources would be sufficient only to pay a relatively small portion of the demands; and (5) the guaranty companies not being amenable to the Federal Bankruptcy Law, the certificate holders cannot avail themselves of the composition provisions of the bankruptcy laws for the purpose of settling their claims against the guaranty corporations.

After reciting these facts, section 1 concludes with the following declaration: "It is therefore hereby declared to be essential for the public interest to provide a procedure under which such bonds, mortgages or other security may be liquidated in an orderly manner and under which the assets of the guaranty corporations may be administered and conserved equally and ratably *in the interests of holders of mortgage investments.*" (Italics the court's.)

It is true that some of the language of section 1 lends support to the view that the statute was intended for the protection of the guaranty corporations as well as for the benefit of holders of guaranteed certificates, *e. g.*, the reference to the impossibility of effecting compositions. Further evidence in the same direction is to be found in the provision of section 3, that the Superintendent of Insurance may take over and exercise all the functions of a guaranty corporation "*for the protection of such guaranty corporation* or of the holders of such mortgage investment." (Italics the court's.)

When the statute is read as a whole, however, it seems fairly clear that it was designed solely in the interest of the certificate holders and not for the benefit of the guaranty companies. The purpose of the Legislature appears to have been to conserve the resources of these companies only "in the interests of holders of mortgage investments" (last words of section 1). The provision in section 7 of the statute that no action taken pursuant to the act (not even the adoption of a plan of reorganization which modifies the mortgage) shall discharge the guaranty corporation, and the provision, in subdivision 3 of section 6, that any plan of reorganization approved by two-thirds, in principal amount, of the certificate holders shall be binding upon the guaranty corporation, tend to confirm this interpretation of the object of the statute.

After declaring the existence of a public emergency in the interest

of the holders of guaranteed mortgage certificates, the Legislature has attempted to meet the emergency in two distinct ways: (1) By authorizing the Superintendent to take over all the functions of the guaranty companies and by conferring upon him very broad powers in respect to the collection and withholding of interest and principal on the mortgages against which the guaranteed certificates have been issued (§§ 3 and 4), and (2) by providing a procedure whereby two-thirds, in principal amount, of the certificate holders of any issue can adopt a plan of reorganization or liquidation which will be binding on the other one-third, as well as upon the guraanty company, without discharging the latter " except as otherwise expressly provided " in the plan (§§ 5, 6 and 7).

Section 8 of the act states that " if any provision of this act is declared unconstitutional or the applicability thereof to any person or circumstance is held invalid, the validity of the remainder of the act and the applicability of such provision to other persons and circumstances shall not be affected thereby." Section 9 provides that the act " shall take effect immediately."

Before considering the constitutionality of the act as " emergency" legislation, it is necessary to determine whether it would be unconstitutional except as " emergency " legislation. Obviously, if the statute would be constitutional though no emergency existed, there would be no need to take up the question of the validity of the act under " the reserved power of the State to protect the vital interests of the community " (*Home Building & Loan Assn.* v. *Blaisdell, supra,* 19) in the case of a public emergency.

Section 3 of the Schackno Act provides that: " The superintendent may, himself or by his duly authorized agent, take over, administer, exercise, conduct, execute and manage, or he may restrict, limit, govern, control, direct and regulate, any or all of the functions of any guaranty corporation with respect to any mortgage investment sold or guaranteed by such guaranty corporation, whenever in his opinion such action is necessary or advisable for the protection of such guaranty corporation or of the holders of such mortgage investment, in the event (1) that such guaranty company has been taken over by the superintendent for rehabilitation or liquidation, or (2) that there is a default under such mortgage investment, or under any bond, mortgage or other security against which such mortgage investment has been issued."

The words " functions of any guaranty corporation " are defined in section 2 so as to include " any or all of the duties, rights, functions, remedies and powers conferred with respect to any mortgage investments upon any guaranty corporation, directly or indirectly, by virtue of any statute, agreement or otherwise."

To the extent that the Superintendent is authorized " to restrict, [and] limit " (§ 3) " any or all of the duties  *  *  *  conferred with respect to any mortgage investments upon any guaranty corporation, directly or indirectly, by virtue of any statute " (§ 2), the act is unconstitutional, under the recent decision of the Appellate Division in this Department in *Moses & Berney* v. *Guaranteed Mortgage Co. of New York* (*supra*) as an illegal delegation of legislative powers to the Superintendent. The balance of section 3, however, transcends no constitutional limitations. Substantially speaking, it constitutes nothing more than a detailed amplification of the powers conferred by subdivision 1 of section 402 of the Insurance Law, which authorizes the Superintendent as rehabilitator " to take possession of the property " of an insurer and " to conduct the business thereof."

A different situation is, however, presented by section 4. That section reads as follows: " The superintendent shall be authorized with respect to any bonds, mortgages or other security held by such guaranty corporation or otherwise, against which any mortgage investments have been issued, to do by himself or by his authorized agent, any of the following:

" (a) To receive, collect and sue for the interest and principal of the bonds, mortgages and other security held by such guaranty corporation or otherwise, or to bring any foreclosure action on the same and take title to the property sold under such action in such name or names as he may determine;

" (b) To deduct from any sum so obtained a reasonable amount to cover the costs and expenses of any such collection, suit, or foreclosure action, or any other functions performed by him pursuant to this act;

" (c) To distribute the balance of such sums so collected to the holders of such mortgage investments or, at the election of the superintendent, (1) to withhold, for such time as he deems expedient or desirable, all or any part thereof, from distribution, or, (2) in his discretion, to apply all or any part thereof for any purpose whatsoever which he deems advisable or necessary for the protection of the interests of the holders of such mortgage investments."

The authority conferred upon the Superintendent in subdivision (a) (*supra*) as far as the statute goes, may be exercised even in cases where the contract between the guaranty corporation and the certificate holders of a given issue contains no provision granting to the guaranty corporation any of the rights which subdivision (a) bestows upon the Superintendent. It may well be that in many instances the guaranty corporation has bound itself to permit a specified trustee or agent for certificate holders to receive and collect

interest and foreclose when necessary or advisable. Surely the Legislature would have no right to impair the obligations of such a contract by empowering the Superintendent to exercise such functions. Only to the extent that the powers enumerated in subdivision (a) are vested in the guaranty company may the Legislature validly confer them upon the Superintendent.

Subdivision (b) authorizes the Superintendent to deduct from sums received by him a reasonable amount to cover the costs and expenses of collection, suit or foreclosure action, or of " any other functions performed by him pursuant to this act." The " other functions " include the promulgation of plans of reorganization, as well as the exercise of the various duties and rights of the guaranty company. The collections received by the Superintendent may, and in many, if not most, cases undoubtedly do, represent trust funds belonging to the certificate holders owning the mortgages in connection with which the collections are made. Manifestly the Legislature may not constitutionally authorize the Superintendent to use such trust funds to cover the costs and expenses of functions performed by him which have no relation whatsoever to the property or to the mortgage involved in the collection, *e. g.*, expenses incurred in promulgating a plan of reorganization affecting an entirely separate and distinct property or mortgage. There is even grave doubt as to the validity of legislation which permits the Superintendent to deduct the expenses of collection or action in cases where the agreement of the guaranty company obligates it to collect and sue at its own expense. As this is the usual and customary agreement of the guaranty corporations, this criticism is by no means academic or of minor importance. In so far as subdivision (b) purports to empower the Superintendent to deduct from trust funds belonging to certificate holders, collected under a mortgage owned by them, expenses in no way related to that mortgage or the mortgaged property, the act is clearly invalid. That the Superintendent has attempted to do this very thing has been brought to the court's attention upon previous applications before it (*Matter of Central Hanover Bank & Trust Co.*, 149 Misc. 488; *Matter of City Bank-Farmers Trust Co.* [*Matter of Lawyers' Title & Guaranty Co.*] Id. 498), where it appeared from affidavits submitted on behalf of the Superintendent himself that trust funds collected by him on various mortgaged properties were mingled with the general funds of the guaranty companies and used to meet their general expenses.

Subdivision (c) goes even further. It authorizes the Superintendent to withhold all or any part of the balance of the funds collected by him " for such time as he deems expedient or desirable "

and " in his discretion " to apply them " for any purpose whatsoever which he deems advisable or necessary for the protection of the interests " of the certificate holders. Thus the Superintendent is permitted to withhold indefinitely from certificate holders all collections made upon their mortgages even though they constitute trust funds belonging to them. What is more, the Superintendent is given the power to expend such funds as he sees fit. It is not even clear that subdivision (c) restricts the Superintendent's right to expend collections received from any mortgage to matters involving or affecting the holders of that mortgage. The fact that the contract between the guaranty company and the certificate holders and/or the legal relationship between them, apart from express contract, may entitle the certificate holders to the entire collections received upon their mortgages is either overlooked or ignored in the statute. Obviously subdivision (c) is unconstitutional to the extent that it allows the Superintendent to deprive certificate holders, for an indefinite period, of interest or principal paid upon mortgages owned by them where those payments constitute trust funds belonging to them. The following language of the Court of Appeals in *Matter of International Milling Co.* (259 N. Y. 77) is appropriate (p. 84): " To hold that the section excludes the petitioner from claiming the identical fund as bailor would in the event the assets should prove insufficient to meet the claims of preferred creditors amount to a confiscation of petitioner's property without due process of law. Such a construction would make the statute unconstitutional."

It is apparent from the foregoing that each of the three subdivisions of section 4 of the act reveals the same defect, viz., a failure to distinguish between mortgages which constitute general assets of the guaranty companies and form part of its capital and surplus on the one hand, and mortgages which are held by the guaranty companies as agent or fiduciary for certificate holders who own them, on the other hand. The opening words of section 4 indicate that the Legislature intended the section to apply to all mortgages " *held by such guaranty corporation or otherwise* " (italics the court's) against which guaranteed certificates have been issued. The section is, therefore, broad enough to cover mortgages held by the guaranty companies as agent or fiduciary and not in their own right, as well as mortgages held by the certificate holders themselves or by a specified agent or trustee (other than a guaranty company) acting in their behalf. Surely the mere circumstance that the certificate holders in such cases possess guaranties issued by guaranty companies is insufficient to justify an act of the Legislature which vests the Superintendent with the broad and drastic powers con-

tained in subdivisions (a), (b) and (c) of section 4. The section is valid only to the extent that the authority which it confers upon the Superintendent is confined (1) to mortgages owned by the guaranty companies and (2) to other mortgages where the powers given to the Superintendent coincide with those granted to the guaranty companies in the contracts between them and the certificate holders. In the latter class of cases the Superintendent, as rehabilitator or liquidator of the guaranty companies, would succeed to their rights, at least until those rights were properly terminated by the certificate holders.

We come now to the most important feature of the Schackno Act, the provision for reorganization of the rights of guaranteed certificate holders and for modification and liquidation of mortgages against which such certificates are outstanding. Section 6 prescribes a procedure whereby holders of certificates representing two-thirds, in principal amount, of any issue may, with the approval of the court, put into effect a plan or agreement for (1) " the readjustment, modification or reorganization of the rights of all the holders of such mortgage investments," and (2) " the modification, readjustment or liquidation of the bonds, mortgages or other security against which such mortgage investments have been issued." Such a plan, approved by two-thirds, in principal amount, of the certificate holders and by the court, " shall be binding upon all the holders of such mortgage investment and the guaranty corporation which shall have sold or guaranteed the same " (§ 6, subd. 3).

The holders of guaranteed certificates in all the cases which have come to the court's attention are tenants in common of the mortgage indebtedness, a chose in action, and of the mortgage securing the same. They own undivided interests in the debt and in the security. Apart from statute, no readjustment of their rights between themselves or of the mortgage indebtedness can be legally effected without their consent, in the absence of a contract expressly permitting such an alteration of the rights flowing from the relationship between them. A statute of a State Legislature which attempts, retroactively, to permit any change in the rights of certificate holders as between themselves or in respect to the mortgage indebtedness, without the consent of all the certificate holders interested in the indebtedness, is clearly unconstitutional as impairing the obligation of contracts in violation of article 1, section 10, clause 1 of the Federal Constitution (*Gilfillan* v. *Union Canal Co.*, 109 U. S. 401, 403, 404). Federal bankruptcy statutes which impair contract rights, *e. g.*, by authorizing compositions in which dissenting minorities are required to accept in discharge of their claims, money, or even notes, for less than par, stand upon a different footing

since the constitutional inhibition is directed against the States only (*New York* v. *United States*, 257 U. S. 591; *Hanover National Bank* v. *Moyses*, 186 id. 181; *Mitchell* v. *Clark*, 110 id. 633; *Canadian Southern Ry. Co.* v. *Gebhard*, 109 id. 527, 535, 539; Rosenberg, " Reorganization, The Next Step," 22 Col. Law Rev. 14, 18; Reorganization of Railroad Corporations, 33 id. 570, 577). Moreover, the Federal Constitution expressly confers upon Congress the power " to establish   *   *   *   uniform Laws on the subject of Bankruptcies throughout the United States " (U. S. Const. art. 1, § 8; see, also, *Canada So. Ry. Co.* v. *Gebhard, supra*, 536, 539). The only question presented in the case of *Federal* legislation is one of due process under the Fifth Amendment, which prohibits confiscatory acts by any branch of the Federal government. The due process clause is likewise the only one involved in reorganizations consummated in Federal courts without specific legislative authority. The clause prohibiting " a Law impairing the Obligation of Contracts " is no more binding upon Federal courts than it is upon Congress since it applies only to " a State " (U. S. Const. art. 1, § 10, cl. 1). As Mr. Justice SCUDDER, writing for the Appellate Division, Second Department, recently said (*Clinton Trust Co.* v. *142-144 Joralemon St. Corp.*, 237 App. Div. 789, at p. 793): " In the Federal jurisdiction it has been comparatively common for courts to take cognizance of reorganization plans in foreclosure and other suits, and to withhold judgment or confirmation of a sale until some fair and open plan of reorganization was presented and substantially agreed upon." It would be a mistake, however, to suppose that a Federal court of equity may lend its aid to a plan of reorganization which alters the rights of creditors and/or stockholders without their consent and that it may force dissenters to participate in the plan and accept new securities provided for therein. Creditors who refuse to assent to a plan of reorganization have " the right to share immediately in a forced sale of the corporation's assets " and a court of equity lacks " power to compel a creditor of any kind to accept stocks or promises to pay in the future in full extinguishment of his claim, without being afforded the alternative of receiving his proportionate share of the proceeds of the conventional sale of the property in cash " (*Coriell* v. *Morris White, Inc.*, 54 F. [2d] 255, at p. 260; see, also, *Bethlehem Steel Co.* v. *International Combustion Engineering Corp.*, 66 id. 409). This is the view of the Circuit Court of Appeals in this circuit and of most authorities upon the law of reorganization (Swaine, " Reorganization — The Next Step; A Reply to Mr. James N. Rosenberg," 22 Col. Law Rev. 121; " Reorganization of Corporations: Certain Developments of the Last Decade," 27 id. 901, 923–927; see, also,

32 id. 668; 33 id. 570, 588, 834, 836). The authority of *Phipps* v. *Chicago, R. I. & P. Ry. Co.* (284 Fed. 945), relied upon for a contrary doctrine (24 Col. Law Rev. 266), is considerably weakened by the fact that the company settled with the dissenters after the United States Supreme Court had granted certiorari (261 U. S. 611; 262 id. 762). It should be stated, however, that upon appeal to the United States Supreme Court from the decree of the Circuit Court of Appeals in *Coriell* v. *Morris White, Inc.* (*supra*), that tribunal expressly refrained from passing upon the question (*National Surety* v. *Coriell*, 289 U. S. 426; 77 L. Ed. 865, 869). Of course, the requirements of due process are complied with if dissenters receive in cash their *pro rata* shares of the proceeds of the conventional sale of the debtor's property.

Nor is it correct to assume that the Federal courts may exercise the power of consummating reorganizations without regard to the financial condition of the debtor or the nature of the latter's business. In the very recent case of *First National Bank of Cincinnati* v. *Flershem* (290 U. S. 504; 54 U. S. R. 298) the United States Supreme Court reversed a decree approving a plan of reorganization and confirming a sale to the reorganization committee over the objections of non-assenting debenture holders. No provision was made in the plan for dissenting debenture holders. The jurisdiction of the Federal court of equity had been invoked for the purpose of compelling the acquiescence of the minority to the plan of reorganization although " insolvency was not present or imminent " (p. 8). Mr. Justice BRANDEIS, writing for the court, pointed out that " the court's power was invoked for a purpose for which it may not be exercised " (p. 7) and that " the suit is clearly without equity." He declared that " the appointment of the receivers and the judicial sale were the device employed to effect a transfer of the assets of the existing corporation to a new one, thereby relieving both from the payment of the former's debts. By these means it was hoped to subject all dissenting creditors to the condition of impotency so frequently occupied by minority stockholders " (p. 9). He declared that " the substantive law affords no warrant for so abridging the rights of individual creditors." Cases of insolvency or threatened insolvency were carefully distinguished in the following language (p. 8): " We have no occasion to consider under what circumstances a court of equity may, through appointment of receivers and judicial sale, lend aid to protect the interests of creditors and effect a reorganization of an *insolvent* corporation. Nor need we consider under what circumstances a court of equity may, because the assets of a corporation are ample to meet all liabilities but cannot then be immediately converted into cash, properly appoint receivers in

order to preserve values and prevent unequal treatment of creditors. The case before us is of a different character. * * * Insolvency was not present or imminent." (Italics ours.)

Despite the fact that " the corporation became insolvent later, long before entry of the order of sale, and * * * but for the appointment of receivers, some non-assenting debenture holders would have obtained a preference," the court held that the dissenting debenture holders were entitled to payment in full upon establishing their claims " because they were prevented by the interlocutory order appointing receivers from proceeding against the assets, fraudulently transferred, and thereby securing a lien, which would have yielded them full payment " (p. 11). Although the court found it unnecessary to consider the jurisdiction of a court of equity to bring about reorganization in cases of insolvency, present or imminent, it did point out that " all the cases in which this Court appears to have exercised this power in aid of a reorganization upon the ground of insolvency dealt with railroads or other public utilities where continued operation of the property and preservation of its unity seemed to be required in the public interest. Moreover, in all those cases the sale was made upon foreclosure." [Footnote.]

It is evident from the foregoing that the powers of reorganization exercised by Federal courts of equity are subject to at least the following limitations: (1) There must be insolvency, immediate or imminent, or other ground of equity jurisdiction, such as supervision over foreclosure sale; (2) dissenters may not be forced to accept new securities provided for in the plan but have the right to receive, as an alternative, their *pro rata* share of the cash proceeds of the conventional sale. The powers of State courts of equity are, of course, no greater. *Clinton Trust Co.* v. *142–144 Joralemon St. Corp.* (*supra*) was a case involving the court's supervision over a foreclosure sale. This is likewise true of the recent case of *Chase National Bank* v. *10 East 40th St. Corp.* (238 App. Div. 370).

Section 6 of the Schackno Act attempts to accomplish by legislation something which courts of equity, Federal as well as State, have been powerless to effect. The effort is rendered abortive at the very outset by the constitutional provision that " No State shall * * * pass any * * * Law impairing the Obligation of Contracts " (U. S. Const. art. 1, § 10, cl. 1). This is not, however, the only respect in which section 6 is invalid. The requirements of due process are not complied with. No provision is made for preserving the rights of dissenting certificate holders by making available to them the cash value of their claims. Instead the act attempts to coerce them into participating in any plan of reorgani-

zation approved by two-thirds, in principal amount, of the outstanding certificate holders and by the court, by making a plan so approved binding upon non-assenters without affording them any alternative relief. Section 15, subdivision 14, of the Debtor and Creditor Law, which authorizes compositions between creditors and an assignor for the benefit of creditors, is clearly distinguishable, for it contains an express proviso " that if there be any creditors not assenting to the composition, the court shall determine what proportion of the fund shall be paid to or reserved for creditors not assenting, *which shall not be less than the sum or share to which they would be entitled if no composition had been made.*" (Italics the court's.) No impairment of the obligations of the assignor's contracts with dissenting creditors is, therefore, involved, especially in view of the fact that the assignor, as distinguished from the assigned estate, is not discharged. There is likewise full compliance with the requirements of due process. The provisions of the Lien Law permitting holders of a specified percentage of the aggregate amount of mechanics' liens filed against property to subordinate the liens to a bond and mortgage to be made by the owner (Lien Law, §§ 26–30) are distinguishable in that section 32 of that statute expressly provides that it shall not apply to liens existing at the time of the taking effect of the statute as amended. As the right to a lien is purely statutory, a lienor could not complain " because that right was thus conditionally given. * * * The Constitution is in no way involved." (*Fine & Sons, Inc.*, v. *Lindarose, Inc.*, 220 App. Div. 616; modfd., on other grounds, 248 N. Y. 137.)

Attention should also be called at this point to the fact that the Schackno Act, by its terms, applies not merely to defaulted mortgages, but equally (a) to mortgages upon which there has been no default, (b) to mortgages upon which no default is even threatened, (c) to mortgages where the obligor on the bond is solvent, and (d) to mortgages upon properties which are amply sufficient, even at present sale values, to pay the full amount of the mortgages with accrued charges. As the act is avowedly designed for the benefit of mortgagees and not for the benefit of mortgagors (protection for the latter being provided for in the moratorium legislation), it does not even possess the justification of being an insolvency statute. It permits holders of two-thirds, in principal amount, of the outstanding certificates of any issue, to reduce the mortgage and/or the interest thereon, and to alter the rights of the holders as between themselves (*e. g.*, by making them stockholders of a corporation instead of tenants in common of a chose in action and the security therefor), *although the mortgage may be undefaulted, the obligor on the bond solvent, and the mortgaged property worth far in excess of the*

*debt even at depression prices. The act appears to confuse the financial condition of the guaranty companies with the financial circumstances of the thousands of mortgagors whose obligations have been guaranteed by those companies.* The guaranty is auxiliary and secondary to the mortgage indebtedness. The primary obligation is the mortgage debt. The fact that the assets of the guarantors may require conservation to prevent their insolvency scarcely constitutes adequate justification, in itself, for a statute which authorizes reorganizations and readjustments of the primary mortgage indebtedness without regard to the solvency of the debtors. A provision for readjustments of the obligations of the guaranty companies would seem to be more appropriate.

Section 7 of the Schackno Act reads as follows:

" § 7. Liabilities not discharged. The liability of any guaranty corporation with respect to any mortgage investments sold, issued, distributed or guaranteed directly or indirectly by it shall not be discharged by any action taken pursuant to this act, except as otherwise expressly provided in any plan or agreement promulgated and approved as herein provided."

In so far as this section is applicable to guaranties executed prior to its enactment it is manifestly unconstitutional. At the time the guaranty corporations issued their guaranties they had the right to rely upon the protection afforded them under well-settled principles of the law of suretyship and guaranty. They had the right, for example, to expect that any modification of the guaranteed indebtedness without their consent would discharge them from liability. The law applicable to their contracts of guaranty at the time they were entered into constitutes part of the obligations 'of those contracts, and cannot be altered retroactively without running foul of the clause of the Federal Constitution which prohibits States from passing laws impairing the obligations of contracts. The attempt to retain the liability of the guaranty corporations, notwithstanding the nature and extent of modifications of the guaranteed indebtednesses effects without their consent, is clearly ineffectual and cannot be upheld.

Up to this point the Schackno Act has been treated as non-emergency legislation, and its constitutionality discussed upon that basis. We must now consider whether the infirmities of the act as a non-emergency measure are cured and the act rendered constitutional by the legislative declaration of " the existence of a public emergency * * * requiring the provisions of this act."

At the very threshold we are confronted with the failure of the act to fix a definite time limit for its own duration, or as to the existence of the emergency. The statute is even more indefinite

as to time than that declared unconstitutional for indefiniteness as to time in *Moses* v. *Guaranteed Mortgage Co.* (*supra*). In that case Mr. Justice GLENNON, writing the opinion of the Appellate Division in this Department, said: " The second point urged by plaintiffs is that the statute is too indefinite as to time. No one would quarrel with the right of the Legislature to suspend the payment of principal on mortgages such as are involved in this case for a definite period of time. Here, however, the law contains the following provision: ' § 5. The period of the emergency herein provided for shall be from the date of the taking effect of this act until such date as the Legislature may, by joint resolution, designate to be the termination thereof, or if the Legislature be not in session, the date so designated by a proclamation of the Governor.'

" Under the terms of this provision nobody can tell with any degree of certainty when the joint resolution may be passed, or when the Governor, if the Legislature is not in session, may issue a proclamation declaring the emergency at an end. Thus the existing legal rights of plaintiffs may be totally destroyed, and they would appear to have no definite remedy. The rights and obligations of contracts are thus impaired (U. S. Const. art. 1, § 10). It will be noted that in the Mortgage Moratorium Laws the suspension of remedies was for a definite period of time. Here it is indefinite.

" In *Sliosberg* v. *New York Life Insurance Co.* (244 N. Y. 482–497), Judge KELLOGG said: ' In our case the statute requires that actions of a certain class be stayed until thirty days after " the recognition *de jure* of a government of Russia by the government of the United States." In other words, the actions are to be stayed " until the happening of an event which may never happen," as said in *Burt* v. *Williams* (24 Ark. 91). The great weight of authority is to the effect that a State imposing such a stay impairs the obligations of contracts and violates the constitutional limitation.'

" Defendant attempts to sustain the statute upon the broad ground that, in view of the grave emergency which has been proclaimed to exist in the State and in the nation, it is a proper exercise of police power. We do not doubt that the Legislature may enact a law which will control the situation, but we must hold, for the reasons stated, that the statute in its present form is unconstitutional."

In the recent case of *Home Building & Loan Assn.* v. *Blaisdell* (*supra*), the opinion of Chief Justice HUGHES, writing for the majority of the United States Supreme Court, repeatedly empha-

sized the fact that the emergency statute passed by the Minnesota Legislature, which was there upheld as constitutional, was a temporary measure, and was to remain in effect " only during the continuance of the emergency and in no event beyond May 1, 1935." After reviewing the authorities, the learned chief justice declared that the Minnesota statute was constitutional because it complied with (pp. 25–26) " the criteria established by our decisions   *   *   *; 5. The legislation is temporary in operation. It is limited to the exigency which called it forth. While the postponement of the period of redemption from the foreclosure sale is to May 1, 1935, that period may be reduced by the order of the court under the statute, in case of a change in circumstances, and the operation of the statute itself could not validly outlast the emergency or be so extended as virtually to destroy the contracts." [It follows that the Schackno Act is unconstitutional because of its indefiniteness in respect to time.]

In the opinion of the court the constitutionality of the Schackno Act is open to attack on a number of other grounds. As previously pointed out, the Legislature is now in session and an opportunity of promptly amending the act is thus presented. The more weaknesses and infirmities are brought to the attention of the Legislature, the greater the chance of passing a statute which will give the fullest measure of relief that is constitutionally possible. In this situation the court feels impelled to take up various other aspects of the constitutionality of the present act.

Assuming that the " public emergency " referred to in section 1 of the act does actually exist, and that the legislation is, therefore, addressed to a legitimate end, the question nevertheless remains whether " the measures taken are reasonable and appropriate to that end." (*Home Building & Loan Assn.* v. *Blaisdell, supra,* 19.) This is well brought out in the language of the chief justice (at p. 24): " In view of the nature of the contracts in question — mortgages of unquestionable validity — the relief afforded and justified by the emergency, in order not to contravene the constitutional provision, could only be of a character appropriate to that emergency."

Applying this test to the Schackno Act we discover at once that one of the two declared objects of the act, viz., [the administration and conservation of the assets of the guaranty corporations " equally and ratably in the interests of holders of mortgage investments"] (last paragraph of § 1) is defeated rather than achieved by the provision of section 6 for the modification and readjustment of bonds and mortgages by two-thirds, in principal amount, of the certificate holders. Any such modification or readjustment will

have the inevitable effect of discharging the guaranty corporation except, of course, where the latter agrees to the change. A different conclusion might be proper if the emergency declared in section 1 could render constitutional the provisions in section 7 that the liabilities of the guaranty corporation shall not be discharged by any plan of reorganization or other action taken under the statute. The court is of the opinion, however, that the emergency referred to in section 1 cannot validate the provisions of section 7. No extended discussion of this point is necessary. A reading of the illuminating opinion of the United States Supreme Court in *Home Building & Loan Assn.* v. *Blaisdell* (*supra*) indicates convincingly that the guarantor cannot be deprived of a good defense to a claim upon its guaranty, in impairment of the obligations of its contract, permanently and without the imposition of reasonable conditions. No case cited in the opinion or brought to the court's attention has upheld any such drastic legislation in similar circumstances, even under the reserved emergency power of the State. The provisions of section 6 of the act, therefore, have a direct tendency to discharge the guaranty corporations and thus to relieve the assets of such corporations from any claim against them by certificate holders, a result directly contrary to that which it is one of the two avowed purposes of the act to attain.

The other object of the act, according to the language of section 1, is to provide a procedure whereby mortgages may be liquidated " in an orderly manner over a reasonable period of time," " in the interests of holders of mortgage investments." It is not altogether clear just how the provisions of section 6 are appropriate to accomplish this purpose. If two-thirds, in principal amount, of the certificate holders decide, as section 6 permits them to do, upon a plan of immediate liquidation, both objects of the act will be defeated. There will be neither orderly liquidation over a reasonable period of time nor conservation of the assets of the guaranty corporations. There is nothing in the act to prevent immediate liquidation of certificated mortgages unless two-thirds, in principal amount, of the certificate holders decide to withhold liquidation. Furthermore, the declared necessity for preventing immediate liquidation could at most justify a statutory provision which would make it possible to extend liquidation over a reasonable period of time, *e. g.*, a provision empowering a specified percentage of the certificate holders to withhold foreclosure despite the desire of the minority to foreclose, upon condition that reasonable provision be made for paying to the minority their *pro rata* shares of the rental value of the mortgaged property during the period foreclosure is withheld. Statutory authorization of agreements between a

specified percentage of certificate holders and the owners of the mortgaged property for the extension of mortgages upon similar conditions might also be an appropriate remedy for the declared need of orderly liquidation over a reasonable period of time. (The difficulty with such extension agreements, however, is that they would defeat the other purpose of the act by discharging the guaranty corporations.)

The court is, however, unable to perceive that the emergency declared warrants or requires the broad and drastic powers conferred by section 6 upon two-thirds, in principal amount, of the certificate holders. The mere fact that real estate conditions render delayed liquidation necessary or desirable constitutes no justification for permitting some certificate holders to effect reductions of principal or interest or to make other similar changes in the mortgage indebtedness. Under this far-reaching power, the rights of certificate holders could be substantially impaired if not entirely destroyed. A $500,000 mortgage could be reduced to $100,000, thereby changing a $5,000 certificate to one for $1,000. A law designed to benefit and aid certificate holders might thus be made the instrument with which to work serious harm and prejudice to them. It is no answer to say that the practical probabilities are against the approval of a plan as fair by two-thirds, in principal amount, of the certificate holders and by the court, unless the situation requires it. Each certificate holder has the rights of a tenant in common and he need not, against his will, place those rights in the hands of other certificate holders or of the court for them to deal with as they may see fit. It may be that occasions will arise when withholding of foreclosure or even extensions of time will not afford adequate relief to certificate holders, and when reorganization or modification will be imperatively necessary. The occurrence of a number of such situations, or even of many of them, would not, however, be sufficient to justify emergency legislation permitting some certificate holders to alter the rights of others as between themselves or to modify the terms of the bond and mortgage. The legislation must be " not for the mere advantage of particular individuals but for the protection of a basic interest of society." (*Home Building & Loan Assn.* v. *Blaisdell, supra,* 24.) Legislation authorizing the change of certificate holders' rights as between themselves, *e. g., under the corporate Schackno plan, by changing their rights from those of tenants in common in a chose in action and in the mortgage securing it "to the condition of impotency so frequently occupied by minority stockholders"* (*First National Bank of Cincinnati* v. *Flershem, supra,* 9), must be predicated upon conditions requiring such relief, *which affect such a large part of the*

community as to directly affect the fundamental interests of the State itself (Home Building & Loan Assn. v. Blaisdell, supra, 22; see, also, Sliosberg v. N. Y. Life Ins. Co., 244 N. Y. 482, 498). This is likewise true of legislation permitting modifications (other than extensions) of mortgage indebtednesses. The declaration of the emergency contains no statements which would even tend to indicate the *widespread* existence of conditions incapable of being remedied by postponement of liquidation and requiring the readjustment of certificate holders' rights as well as modification of the mortgage indebtednesses.

Another instance of the inappropriateness of the relief afforded to the emergency declared is to be found in the failure of the act, as previously pointed out, to distinguish between mortgages in default and those which have been fully complied with and upon which no default has been suffered. The fact that in numerous cases the obligors on the bonds may be amply solvent and/or that the mortgaged premises, if sold, might realize more than the mortgage indebtednesses, even at present prices, has been wholly disregarded. The same power to alter and impair the rights of nonassenting certificate holders has been granted to two-thirds, in principal amount, of the certificate holders in the case of undefaulted mortgages securing bonds of solvent obligors as in the case of defaulted mortgages and insolvent obligors. It is difficult to believe that the emergency which exists requires or justifies the bestowal of such broad powers upon the holders of two-thirds of the indebtedness in the case of undefaulted mortgages with responsible obligors. The fact that the solvency of the *guaranty companies* may be threatened is of no consequence. Surely the impaired resources of a *guarantor* do not warrant alterations of the guaranteed *debts* where the *debtors* are not in arrears and are able to continue making payments on account of the debts. The situation would be different if the purpose of the act were to protect and benefit the guaranty corporations, but even in that event the statute would be unconstitutional because designed " for the mere advantage of particular individuals " (Home Building & Loan Assn. v. Blaisdell, supra, 24; Sliosberg v. N. Y. Life Ins. Co., supra, 498).

The validity of the provisions of section 6 is also open to grave doubt on the ground that the provision for plans of " readjustment, modification, or reorganization of the rights of all of the holders of such mortgage investments, and the modification, readjustment or liquidation of the bonds, mortgages or other security against which such investments have been issued " contemplate and authorize relief of a permanent and not a temporary character. The majority opinion in the Home Building case (supra), as previously observed,

stresses throughout the temporary nature of the relief granted by the Minnesota statute, viz., an extension of the period within which the mortgagor might redeem, but not beyond May 1, 1935. All the authorities discussed in the comprehensive opinion, which uphold emergency legislation in circumstances at all analogous to those here present, involved statutes of temporary and limited application. As Chief Justice HUGHES well said (pp. 19, 20): " Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a . construction which would permit the State to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them. But it does not follow that conditions may not arise in which a *temporary* restraint of enforcement may not be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the State to protect the vital interests of the community. It cannot be maintained that the constitutional prohibition should be so construed as to prevent *limited and temporary interpositions* with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake. (See *American Land Co.* v. *Zeiss*, 219 U. S. 47.) The reservation of state power appropriate to such extraordinary conditions may be deemed to be as much a part of all contracts as is the reservation of state power to protect the public interest in the other situations to which we have referred. And, if state power exists to give *temporary* relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood, or earthquake, that power cannot be said to be non-existent when the urgent public need demanding such relief is produced by other and economic causes." (Italics ours.)

*Modifications of the rights of certificate holders, e. g., by converting rights as tenants in common to shareholders' rights in corporations, are not temporary at all. Once the alteration is made the rights previously possessed are irretrievably extinguished.* This is likewise true of modifications or readjustments of the mortgage. A reduction of principal or interest is permanent and final. The end of the emergency will not restore what has been surrendered. The only modifications which may be said to be temporary in character are those which extend or postpone the time of payment or other compliance with the terms of the mortgage. It is extremely

doubtful that an emergency exists which is sufficient to warrant the permanent relief which is provided for in section 6 of the statute under consideration. Amending the law by fixing a time limit for the act or for the emergency will not remedy this defect. The permanent and lasting character of steps taken in pursuance of section 6 would remain unaffected by such an amendment.

The unconstitutionality of section 3, to the extent that it attempts to delegate legislative power to the Superintendent, is likewise unaffected by the fact that the act constitutes "emergency" legislation.

We turn now to section 4. It has already been demonstrated that said section is clearly unconstitutional except as emergency legislation. As emergency legislation it is equally invalid because of the indefiniteness of the act as to its own duration or as to the period of the emergency. Even if a definite time were fixed, section 4 would still remain unconstitutional. No emergency is declared nor does one at the present time exist which could vindicate or sanction a statute authorizing the Superintendent (1) to withhold from their owners trust funds which do not constitute general assets of the guaranty companies, (2) to deduct from such funds expenses incurred in exercising functions wholly unrelated to the funds, and (3) to use all or any part of the funds as he may deem advisable. Such plain and arbitrary deprivation of the property of others without just (or any) compensation cannot be defended, even as emergency legislation.

For the reasons indicated, the court is constrained to reach the conclusion that sections 3 and 4 of the Schackno Act are unconstitutional in the respects previously referred to, that sections 6 and 7 are likewise unconstitutional, and that the Superintendent must, therefore, be enjoined from making any payments for expenditures incurred in connection with plans of reorganization promulgated under the act. The motion is granted. Settle order.