In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property of and Rehabilitate the NEW YORK TITLE AND MORTGAGE COMPANY.

Supreme Court, New York County, December 12, 1934.

*Greenbaum, Wolff & Ernst* [*Morris L. Ernst* and *Lawrence S. Greenbaum* of counsel]; *Harry Rodwin* [*Adolph Kaufman* and *Nathaniel J. Palzer* of counsel], for the Superintendent of Insurance.

*Wagner, Quillinan & Rifkind* [*Simon H. Rifkind* and *Francis J. Quillinan* of counsel], for the committee for reorganization of series F-1.

Numerous appearances for other parties interested.

FRANKENTHALER, J. This is a proceeding under the Schackno Act (Laws of 1933, chap. 745, as amd.) for the reorganization of a series of first mortgage participation certificates issued and guaranteed by New York Title and Mortgage Company, and known as series F-1. Pursuant to the authority conferred upon him by

section 6 of the act, the Superintendent of Insurance has promulgated a plan of " reorganization of the rights of all of the holders of " series F-1 certificates and has served notice upon the owners of such certificates that the plan would be presented to the court for approval, modification or disapproval. In the event an order is made approving the plan as submitted or modified, it is to become binding upon all the certificate holders if, as and when " the holders of two-thirds in principal amount of such mortgage investments," exclusive of any part held by the title company, " shall have consented to such plan " (Laws of 1933, chap. 745, § 6, subd. 2). Protracted hearings have been held at which certificate holders have voiced a number of objections to certain features of the Superintendent's plan and numerous amendments have been proposed by attorneys representing various groups of certificate holders. The court is now obliged to determine whether to approve, modify or disapprove the plan.

A brief outline of the nature of the series F-1 issue and of the status of the mortgage properties securing it will make for a better understanding of the plan, and, even more so, of the modifications suggested on behalf of certificate holders. As of August 31, 1934, certificates of the aggregate face amount of $27,463,985.28 were outstanding in the hands of others than the New York Title and Mortgage Company, while unsold certificates, including those held by the title company, amounted to an additional $446,973.24. As security for the payment of the certificates, the title company on the same date had on deposit with the Bank of Manhattan Trust Company one hundred and twenty-one mortgages (including foreclosed mortgages) of the principal amount of $27,889,156.67. The cash collateral available for the payment of principal amounted to an additional $21,801.85. These are the figures of the Superintendent of Insurance. The certificates do not represent shares in any specific mortgage or mortgages. The issue is what is known as a " group issue." The certificates are secured by a group of mortgages deposited with the Bank of Manhattan Trust Company, each certificate constituting " an undivided coordinate share of the same amount in the principal sum secured by the bonds and mortgages or in the money secured " to the title company in the deposited bonds and mortgages. The title company had the right to withdraw deposited mortgages and substitute others, provided the latter met certain requirements specified in the certificates and in the agreement between the title company and the depositary. The terms of the certificates and of the deposit agreement are very similar to those considered by the Court of Appeals in *Matter of People* (*Title & Mortgage Guarantee Co.*) (264 N. Y. 69). The

deposited mortgages (including those foreclosed) cover ninety-eight properties in the borough of Bronx and twenty-three in the borough of Manhattan. The properties are widely diversified in character as well as in location. There are brick elevator apartments from five and one-half to sixteen stories high, brick walk-up apartments from four to six stories high, a motion picture theatre, a building with lodge rooms and meeting halls, garages, a taxpayer, a swimming pool and skating rink, and elevator store and loft buildings from five to seventeen floors in height. One parcel consists of vacant land.

On August 31, 1934, thirty-seven of the one hundred and twenty-one properties were still in the possession of their owners. Only six of the thirty-seven owners were not in arrears in respect to their obligations under the mortgages upon their premises. The other thirty-one owners were permitted by the Superintendent of Insurance to remain in possession and control of their properties, although they were in default as to past due principal in the aggregate sum of $4,443,481.67, and as to interest, taxes and amortization in the aggregate amounts of $326,743.23, $119,292.90 and $134,525, respectively. Nineteen other mortgages were in the process of foreclosure. In twenty-five instances assignments of rents had been taken from owners. Forty mortgages had been foreclosed, and title had been taken in thirty-seven cases in the name of Land Estates, Inc., or Liberdar Holding Corporation, wholly owned subsidiaries of New York Title and Mortgage Company, and in the other three in the name of New York Title and Mortgage Company. The total principal amount of the mortgages on the one hundred and twenty-one parcels was $27,889,156.67, of which $14,852,056.67 was past due and unpaid. Arrears of interest were $1,911,468.44, of taxes $767,126.73, and of amortization $561,275. The total arrears, including the principal of past due mortgages, amounted, as of August 31, 1934, to $18,091,926.84. The arrears of interest and taxes alone were $2,678,595.17. To meet these arrears, the Superintendent of Insurance, according to his report accompanying the proposed plan, had in his possession $98,025.66. An additional $139,463.40 in the hands of the Superintendent is being held by him as a reserve for the payment of his " service fee " for the year expiring August 1, 1934. This represents a charge of one-half of one per cent of the principal amount of all the mortgages comprising series F-1, foreclosed or unforeclosed, for one year's services by the Superintendent of Insurance as rehabilitator of the series F-1 issue. Prior to rehabilitation, the title company had made a charge in the same amount, but it represented not merely a charge for the servicing of the mortgages

but also a premium for the company's guaranty. Since August 1, 1934, the Superintendent has placed the servicing of the F-1 properties and mortgages in the hands of a servicing corporation and has paid the latter a servicing fee of $23,240.96 for the months of August and September, 1934. This is at the yearly rate of $139,445.76, which likewise represents an annual charge of one-half of one per cent of the outstanding F-1 mortgages, foreclosed and unforeclosed. According to the Superintendent's figures (Exhibit 2) only $116,106.71 has been disbursed to certificate holders by way of interest during the fourteen months period of rehabilitation from August 4, 1933, to October 5, 1934. The servicing expense of the Superintendent and the servicing corporation for the same period amounts to $162,704.36, almost one and one-half times the income paid to the certificate holders during the same period. Had the certificate holders been paid interest at the guaranteed rate of five and one-half per cent, they would have received approximately $1,762,202.39 during the same period instead of the $116,106.71 actually turned over to them. The servicing charge of $162,704.36 does not include counsel fees or fees paid to agents managing the various properties comprised in series F-1, but is in addition to those fees. When rehabilitation commenced on August 4, 1933, forty-three owners were in possession of F-1 properties (Superintendent's Exhibit 3) and thirty-seven owners still remained in possession on August 31, 1934, thirteen months later (Superintendent's Exhibit 2, also summary statement attached to Superintendent's plan). Instead of thirty-five assignments of rents existing on August 4, 1933 (Superintendent's Exhibit 3), there were on August 31, 1934, twenty-five such assignments (Superintendent's Exhibit 2). The number of foreclosed units, which was thirty-eight on August 4, 1933, was forty on August 31, 1934, while the number of parcels under foreclosure changed from five on August 4, 1933, to nineteen on August 31, 1934. In other words, during thirteen months of rehabilitation, the Superintendent of Insurance took six out of forty-three properties away from their owners, leaving owners in possession of thirty-seven properties, of which thirty-one were in default, and he commenced sixteen foreclosure actions, of which two went to foreclosure.

The Superintendent, it is true, claims that the thirty-one defaulted owners in possession are subject to rigid supervision under renting agreements, but it is obvious that the opportunities for waste and diversion of funds are much greater than if the Superintendent were in possession himself under an assignment of rents or through a receiver. Arrears of interest during the same period mounted from $805,060.52 on August 4, 1933, to $1,911,468.44 on August

31, 1934, an increase of $1,106,407.92. Arrears in amortization payments have fallen from $766,341.67 on August 4, 1933, to $561,275 on August 31, 1934, a difference of $205,066.67, and arrears of taxes have declined from $1,118,119.85 on August 4, 1933, to $767,126.73 on August 31, 1934, a difference of $350,993.12. Subtracting the total decrease in arrears of taxes and amortization from the increase in interest arrears, we find that there remains a *net* increase in interest arrears of $550,348.13 during the thirteen months of rehabilitation expiring August 31, 1934.

The foregoing figures may perhaps explain the unanimity with which certificate holders who expressed their views on the hearings held in this proceeding favored a plan which would take the management of the F-1 properties and mortgages out of the hands of the Superintendent of Insurance as soon as it was legally possible to accomplish that very much desired result. Outstanding attorneys (among them Wagner, Quillinan & Rifkind, A. A. Berle, chamberlain of the city of New York, and James N. Rosenberg), representing holders of between eight and thirteen million dollars in face amount of F-1 certificates, have demanded that any plan of reorganization submitted to the certificate holders for the approval of the two-thirds required by the Schackno Act contain a provision for the ouster of the Superintendent of Insurance from the management of the F-1 issue immediately upon the approval of the plan by the necessary two-thirds of the certificate holders. Not a single contrary view was expressed by any certificate holder except that one attorney, who concurred in the desire to replace the Superintendent of Insurance as soon as practicable, took the position that the Superintendent should not be ousted immediately upon the effective date of the plan but should continue in charge for a very short period until the certificate holders could elect trustees to succeed him. The only dissent came from the Superintendent of Insurance. The very plan promulgated by the Superintendent constitutes a recognition on his part of the undesirability of permitting the administration of series F-1 to remain in his hands. The plan of the Superintendent is bottomed upon the proposal that the holders of F-1 certificates elect three permanent trustees who are to take over from him the possession and management of the F-1 properties and mortgages and to administer them under a " Declaration of Trust " to be executed by them at the time they enter upon the discharge of their duties. The object and purpose of the trust is to be the orderly and businesslike liquidation of the trust estate " having due regard for the present depressed condition of the real estate market, so as not to sacrifice the interests of the Certificate Holders but to yield to them as

large a proportion of their original investment as is reasonably possible." Pending final liquidation the income of the trust estate is to be distributed among the certificate holders semi-annually after the deduction of expenses and reserves for improvements, repairs, taxes, water rates and similar charges.

The " Declaration of Trust " confers upon the trustees all the powers deemed necessary to enable them to deal as efficiently as possible with the many complex and intricate problems and situations which are likely to confront them in the administration of the 121 properties and mortgages of series F-1 under present abnormal conditions. Many of these powers are not possessed by the Superintendent of Insurance and, therefore, cannot be exercised by him at the present time. The powers to be conferred upon the trustees include the power to extend the maturities of bonds and mortgages, to exchange bonds, mortgages and/or properties for securities issued by Home Owners' Loan Corporation, to reduce interest rates and alter dates of payment, as well as the power to borrow funds for specific purposes. Some of the powers to be granted to the trustees are to be exercised without the court's approval and others only with it. Once a year the trustees are to file an account of their proceedings during the previous year and a budget of their plans for the ensuing year. The certificate holders are to have the opportunity of being heard as to the accounting and as to the budget before either is approved by the court. The guaranty of the New York Title and Mortgage Company is not to be discharged by the adoption of the plan. The trustees are to waive their right to statutory commissions and are to receive such compensation as the court may fix, but in no event more than the statutory commissions. Each trustee is to give a bond for the faithful performance of his duties, in such amount as the court shall determine.

Provision is also made in the plan for the method of electing trustees and for their removal, if so desired, and the election of successors. Within ninety days after the plan has gone into effect by virtue of the approval of the court and two-thirds in principal amount of the F-1 certificate holders, nominations of trustees may be made by filing nominating petitions with the Superintendent of Insurance. Only those nominated by the holders of at least two per cent in principal amount of outstanding certificates may qualify as nominees, and no certificate holder may make more than one nomination. The time for the nominations may be extended by the court, for good cause shown, for not more than an additional sixty days. Ballots are then to be forwarded to the certificate holders by the Superintendent of Insurance together with a list

of the eligible nominees. All ballots are to be returned to the Superintendent within thirty days after their mailing to the certificate holders. Each certificate holder is to have the right to cast one vote for each $100, in face value, of certificates owned by him, fractions of $100 to be disregarded. Provision is made for cumulative voting. The candidates receiving the three highest number of votes are to be certified by the Superintendent to the Supreme Court and are to become the trustees upon executing the " Declaration of Trust." Any trustee is to be removable for cause by the Supreme Court, and, with or without cause, by majority vote of the certificate holders. A vacancy is to be filled by election of a successor trustee by the certificate holders. A vote of the certificate holders as to the removal of a trustee may be demanded by holders of twenty per cent in principal amount of outstanding certificates, and an election of a trustee is to be called by the court whenever there is a vacancy to fill.

Under the Superintendent's plan, a period of not less than four and not more than six months would elapse between the effective date of the plan and the election of the trustees. During this period the plan contemplates that the Superintendent of Insurance will continue to be in charge of the administration of the F-1 properties and mortgages. Moreover, the plan contains provisions conferring upon the Superintendent, for this interim of from four to six months, powers which he does not possess at the present time, viz., to extend the maturity date of any bond or mortgage or installment of principal up to December 1, 1937, to reduce the rate of interest payable under any bond or mortgage and change the date of payment thereof, and to exchange all or any part of any bond or mortgage or property for securities issued by Home Owners' Loan Corporation, and, if obtainable, a junior mortgage or other security to cover any unfunded balance. And lastly, the plan provides that in the event that a special State agency in the nature of a mortgage authority, commission or board, shall be created by the Legislature of this State, the certificate holders may vote on the proposition " that such state agency act as sole trustee in place of the three trustees herein provided for." If the votes cast in the affirmative exceed the votes cast in the negative and also exceed the highest number of votes cast for any other nominee for the position of trustee, the State agency is to be the sole trustee and to enter upon its duties as such.

These are the main features of the plan promulgated by the Superintendent of Insurance. In essence it calls for the management of the F-1 mortgages and properties by trustees accountable to the court and to the certificate holders instead of by the Super-

intendent of Insurance or by a corporation comparatively free from judicial or other supervision. For almost a year this court has time after time pointed out the desirability of management by such trustees. (*Matter of New York Title & Mortgage Co.*, 150 Misc. 488; *Matter of New York Title & Mortgage Co.*, Id. 89; *Matter of New York Title & Mortgage Co.*, Id. 679.) In Westchester county Mr. Justice BLEAKLEY has taken the same view. " The [corporate] plan submitted herein is undoubtedly the best that has been devised under the provision of the Schackno Act. It, however, permits the rehabilitator to free himself of a serious burden, deprives the court of further jurisdiction over the mortgage and leaves the certificate holders, particularly the minority, subject to the perils of corporate management. * * * *I have reached the conclusion that the appointment of trustees is far more desirable. With the establishment of a fiduciary relationship and the right of supervision remaining with the court the rights of certificate holders will be better protected.*" (*Matter of Rehabilitation of Lawyers Westchester Mortgage & Title Co.* [*Chatsworth Gardens*], N. Y. L. J. Feb. 7, 1934.)

The Schackno Act has been in effect since May, 1933. During the month of January, 1934, the Superintendent of Insurance promulgated a plan of reorganization for series F-1 which provided for the formation of a corporation to take over all of the properties and mortgages of that series. The certificate holders were asked to approve the formation of such a corporation and to accept stock and debentures therein in exchange for their mortgage certificates. Hearings were held from time to time but no definite results were achieved because of the opposition of the certificate holders to the so-called " corporate plan." As pointed out by Mr. Justice BLEAKLEY (*Matter of Rehabilitation of Lawyers Westchester Mortgage & Title Co.* [*Chatsworth Gardens*], *supra*), the corporate plan " leaves the certificate holders, particularly the minority, subject to the perils of corporate management " and " deprives the court of further jurisdiction." In *Matter of Westchester Title & Trust Co.* (N. Y. L. J. Oct. 25, 1934) Mr. Justice BLEAKLEY again commented upon the defects of the corporate plan and declared that a plan calling for management by trustees was much more desirable: " It is clear that the administration by the superintendent was temporary in character. It is necessary to devise a plan for permanent administration. * * * Corporations are unsatisfactory. They are expensive and subject to practically no court supervision. A plan, known as the trustee plan, has been devised. It calls for the appointment of three trustees who will operate the trust under a declaration of trust. * * * This plan does insure a quick, efficient and intelligent form of action,

resulting in a conservation of the assets regardless of character or value."

In *Matter of New York Title & Mortgage Co.* (150 Misc. 467, at p. 477) this court indicated its disapproval of the corporate plan by quoting from the opinion of Mr. Justice BRANDEIS, writing for the United States Supreme Court in *First National Bank of Cincinnati* v. *Flershem* (290 U. S. 504): " By these means it was hoped to subject all the dissenting creditors to the condition of impotency so frequently occupied by minority stockholders.'

Early in October, 1934, the Superintendent promulgated the present plan to turn over the administration of the F-1 properties and mortgages to trustees. On the Superintendent's motion the proceeding for the adoption of the corporate plan was consolidated with the proceeding for the adoption of the trustee plan for the purpose of making the minutes of the hearings on the corporate plan part of the record in connection with the proposed trustee plan. The Superintendent has advised the court that he approves the trustee plan which he has himself promulgated. In effect, therefore, the corporate plan has been withdrawn or abandoned.

That the Superintendent's recognition of the benefits to be obtained through management by trustees and of the superiority of a plan calling for such management over any other is not of recent origin, is evidenced by the fact that in Westchester county he has previously promulgated plans of reorganization which provide for the administration of the certificate holders' properties and mortgages by trustees. (See *Matter of Westchester Title & Trust Co., supra.*) While vigorously opposing the amendment proposed by the F-1 certificate holders which seeks to empower the Supreme Court in New York county to appoint even temporary trustees, the Superintendent has himself promulgated a plan in Westchester county which calls for the appointment of three permanent trustees by the Supreme Court of that county to administer the properties and mortgages within the jurisdiction of that court. (*Matter of Westchester Title & Trust Co., supra.*) In Westchester county the Superintendent's plan provides for trustees to be appointed by the court and not to be elected by the certificate holders, while in New York county the Superintendent insists that trustees be elected by the certificate holders and not appointed by the court.

With the principal features of the Superintendent's plan, all the certificate holders who appeared on the return day of the application for the approval of the plan are in enthusiastic agreement. All, without exception, expressed the view that the earlier the administration of the affairs of series F-1 could be legally taken from the

Superintendent, the better it would be for the certificate holders. The results of the Superintendent's management, judged by his own figures, were deemed by them to be so unsatisfactory that no time was to be lost in divesting him of his control over their property. One of their chief objections to his plan was that it did not get him out fast enough. Until approval of a plan by two-thirds in principal amount of the certificate holders and by the court, the Superintendent cannot legally be deprived of his control over the F-1 properties (*Matter of New York Title & Mortgage Co.*, 241 App. Div. 351), but no justification for allowing the Superintendent to continue in charge of the F-1 properties *for an additional period of from four to six months after a plan had received such approval* was apparent to even a single certificate holder who expressed his views at the hearings upon the plan. In addition to sharp criticism of the Superintendent's management, great emphasis was placed upon the fact that he occupied a dual position, representing at the same time the certificate holders and the guarantee company of which they are creditors, and also upon the Superintendent's public admissions that the Insurance Department is not equipped for the handling of the properties and mortgages involved in the guaranteed mortgage situation. In the light of these circumstances, each and every certificate holder who presented his views at the hearings, with a single exception previously referred to, asked the court to modify the plan by providing for the appointment of temporary trustees for the period elapsing between the approval of the plan by the necessary number of certificate holders and the election of permanent trustees, instead of permitting the Superintendent of Insurance to continue in control during that interim period. Mr. Rifkind, of Wagner, Quillinan & Rifkind, attorneys for the committee for the reorganization of series F-1 (originally organized at the request of the Superintendent of Insurance), stated that at a meeting of about 250 holders of F-1 certificates exceeding $12,000,000 in principal amount, it was the unanimous view of all there present that the plan be modified so as to provide for the appointment of temporary trustees by the court immediately upon the plans taking effect (Minutes of Hearing of Nov. 2, p. 92): " So, what we want as far as the Committee of the Reorganization of Certificate Holders are concerned is as promptly as possible to put this into the hands of the certificate holders. Since we cannot, as the Superintendent's plan indicates, have that immediately upon the consummation of the plan, then I turn to the Court and we say, will the Court give us an administration in the interval so as to fill that gap over a properly adequate period?" Mr. James N. Rosenberg, representing holders of certifi-

cates amounting to about half a million dollars in principal amount, voiced the same view, as did A. A. Berle, chamberlain of the city of New York, and Sherman Rogers, his counsel, holding certificates of a face amount of half a million dollars. Other attorneys representing holders of certificates in large and small amounts, totalling several million dollars in face amount, also urged the appointment by the court of temporary trustees for the interim period mentioned above. Those objecting to that phase of the plan which calls for the Superintendent's continuing in control of the F-1 properties and mortgages until the election of trustees were even more vigorously opposed to the proposal to confer additional powers upon the Superintendent during the interim period.

There is one other feature of the Superintendent's plan which has provoked the opposition of practically all the certificate holders who have set forth their views at the hearings, and that is the provision which permits the election of a State agency or authority as sole trustee if the votes in favor of the agency exceed those against it, and also exceed the highest number of votes cast for any nominee for the office of trustee. The certificate holders point out that strenuous efforts made at both the regular and extraordinary sessions of the Legislature held during the past year to have a law passed creating a State agency to handle the guaranteed mortgage situation have met with failure, and they claim that it is a matter of speculation whether such an agency will be authorized in the future. They also stress the fact that the idea of placing the administration of the F-1 properties and mortgages in the hands of a State agency is fundamentally opposed to and inconsistent with the whole theory, purpose and spirit of the trustee plan promulgated by the Superintendent and favored by each and every certificate holder who has let his wishes be known. The very keynote and corner stone of the trustee plan is that the management of the properties and mortgages securing each issue of certificates be transferred from the centralized administration of a single State official or department to trustees who will be charged with the management of only that single issue, and who will be directly responsible to the certificate holders of that issue and to the court. The predominant aim and purpose of the plan is to decentralize the handling of guaranteed mortgages and the properties securing them so that the management of each issue will be divorced from that of every other issue and so that the properties of the various issues will be permitted to enter into free competition with one another. The concept of a State agency or authority to operate and administer the affairs of thousands of different issues is, it is obvious, so essentially contrary to the

vital principles of the trustee plan, that it represents in fact a totally different plan. The plan promulgated by the Superintendent permits a mere majority *of those voting upon the question* to choose as sole trustee any State agency which may be created in the future. It does not even require the affirmative vote of the holders of a majority of the outstanding certificates. Certificate holders maintain that either the provisions permitting the selection of a so far non-existent State agency as sole trustee should be eliminated from the plan or else the plan should require the favorable vote of two-thirds in principal amount of all the holders of outstanding certificates in order to entitle any State agency to become sole trustee.

The objections to the provisions of the Superintendent's plan in respect to the selection of a State agency may be quickly disposed of. The court is in entire accord with the position taken by the certificate holders. The selection of a State agency to act as sole trustee of the properties and mortgages of series F-1 would strike at the very heart of the trustee plan. The plan seeks decentralized management instead of the centralized administration now vested in the Insurance Department. Management by a State agency would mean restoration of centralized administration, the very evil which the plan seeks to correct. Transferring the supervision and operation of many thousands of properties and mortgages of various issues from the Insurance Department to a new State agency or authority would accomplish little more than a change in the name of the State department in charge. The alteration would be one of form, not of substance. So radical a departure from the theory and underlying principles of the trustee plan should not be permitted to take place without the approval of the same number of certificate holders as is necessary to adopt the plan itself, viz., two-thirds, in principal amount, of the holders of outstanding certificates. The certificate holders should not be compelled to choose between a plan which permits a minority to select a State agency to administer their properties and a continuation of the existing unsatisfactory situation, which would inevitably result from failure to approve the plan. The court will accordingly modify the proposed plan by substituting a provision that no State agency may be selected as sole trustee except by the affirmative vote of two-thirds in principal amount of all the F-1 certificate holders, exclusive, of course, of the certificates held by the title company or by the Superintendent as its rehabilitator.

We turn now to the question of temporary trustees. The court is in complete sympathy with the widespread desire of the cer-

tificate holders to take the management of their property from the Superintendent of Insurance at the earliest possible date. There are, however, a number of serious objections to submitting to the certificate holders for their approval a plan which calls for the appointment by the court of temporary trustees. The appointment of temporary trustees will necessarily involve the expense of an accounting proceeding when the trust estate is turned over to permanent trustees, especially if the permanent trustees elected by the certificate holders should not be the same individuals as the temporary trustees appointed by the court. In that event there will also be a break in the continuity of the management of the F-1 properties. The temporary trustees will scarcely have had the time to familiarize themselves with the many and complex problems involved in the operation and handling of the F-1 properties and mortgages when they will find themselves replaced by permanent trustees, who will be obliged to repeat the entire process. This will result in waste of time, duplication of effort and unnecessary expense. The suggestion made by many of the certificate holders that the temporary trustees serve for a period of one year is open to the added objection that the election of permanent trustees should be held as soon as practicable, so that the wishes of the great body of certificate holders may be given effect at the earliest possible date. The proposal that interim trustees be appointed is bitterly opposed by the Superintendent of Insurance. He regards his own retention of control and management of the F-1 properties until the election of permanent trustees as an integral part of the plan promulgated by him. It is not unlikely that the adoption of the proposal for interim trustees would encourage an appeal, which would only serve further to delay the reorganization of the F-1 issue and thus to prolong indefinitely the control and management of the properties of that issue by the Superintendent of Insurance. The proposal would, therefore, tend to defeat its own purpose. Furthermore, there is some force in the claim made by the Superintendent of Insurance that the interim period preceding the election of permanent trustees is likely to be a crucial one, and that the permanent trustees may in many instances find, upon their taking office, that they are bound by the acts of the temporary trustees whom they have succeeded.

Under such circumstances, should a plan of reorganization be submitted to the great mass of certificate holders of the F-1 issue which provides for temporary trustees appointed by the court and offers them the choice of accepting a plan embodying such a provision or else obtaining no plan at all? The court is of the opinion that this question must be answered in the negative. The duty of

the court under the Schackno Act is to see to it that the plan submitted to the certificate holders is fair to all of them. Even the approval of two-thirds of the certificate holders is not sufficient to render a plan effective, unless it is accompanied by the sanction of the court. This requirement is obviously intended as a protection to the minority whose affirmative approval may be lacking. Here less than two-thirds, in principal amount, of the certificate holders have expressed their views. It may well be that the proposal for the appointment of temporary trustees will not receive the approval of the necessary two-thirds. In that event all the efforts which have so far been made to reorganize the F-1 issue and to deliver its properties to representatives of the certificate holders' own selection will be rendered abortive, and the Superintendent of Insurance will continue in control of the F-1 affairs. The ideal solution would be to present two alternative plans to the certificate holders, one calling for the appointment of temporary trustees until the election of permanent trustees, and the other providing for permanent trustees only, with the Superintendent of Insurance remaining in charge until the election of the permanent trustees. It is very doubtful, however, that the Schackno Act authorizes the submission of alternative plans unless each has been promulgated, as the statute requires, by the Superintendent of Insurance or a specified number of certificate holders. In view of this doubt, the court is reluctant to adopt the expedient of submitting alternative plans, and thereby incur the risk of invalidating any plan which may ultimately receive the approval of the necessary number of certificate holders.

After considerable thought and reflection, the court has come to the conclusion that the solution which would be fairest to the great body of certificate holders is to shorten as much as possible the period elapsing between the effective date of the plan and the election of permanent trustees, thereby reducing to a minimum the time during which the Superintendent of Insurance would continue in charge of the affairs of series F-1. The Superintendent's plan provides for a period of from ninety to one hundred and fifty days for the filing of nominations for permanent trustees and an additional period of thirty days for their election. There appears to be no real need for so long a delay. The election of permanent trustees can be held in much less than four to six months from the effective date of the plan. The Schackno Act itself provides for only twenty days' notice to certificate holders of a hearing upon a proposed plan of reorganization which may vitally affect and alter their rights and interests (Laws of 1933, chap. 745, § 6, subd. 2). There is, therefore, no good reason why the certificate

holders should require more than twenty days for the filing of nominations and more than twenty additional days for the casting of ballots upon the election. It was suggested at the hearings that the longer period provided for in the Superintendent's plan was designed principally for the purpose of delaying the date for the closing of nominations until the next session of the Legislature, in the hope that the efforts of the Superintendent and those associated with him to put through a law creating a special State agency or mortgage authority may this time succeed. The Superintendent's plan gives the certificate holders only thirty days within which to elect trustees from among the nominees, but it provides for a minimum of *ninety* days (which may be extended to *one hundred and fifty* days) for the filing of nominations for individual trustees, or for such special agency or authority. Why ninety to one hundred and fifty days should be needed to nominate if thirty days will suffice to elect is a question which it is difficult to answer. Some of the certificate holders appear to feel that in the guise of submitting to the certificate holders a plan which will enable them, in the exercise of their own free will, to take over their properties and mortgages, the Superintendent is in reality attempting to force a State agency or mortgage authority upon them by prolonging unduly and unreasonably the closing date for nominations, and by permitting the selection of a State agency by a mere majority of votes cast, which need not even be a majority of the outstanding certificates. If the very Legislature which enacted the Schackno Act deemed twenty days sufficient notice to enable certificate holders to be heard upon a plan of reorganization which might alter their rights much more seriously than could the nomination or election of one individual or another as trustee, it is obvious that the same legislative yardstick may be applied to the periods required for nominations and elections and that twenty days for each is sufficient. After all, the Superintendent's own plan only gives them thirty days for the election. It follows that the nomination and election of permanent trustees can be effected within approximately one and one-half months after the plan has received the approval of the necessary two-thirds of the certificate holders.

During this period of one and one-half months the Superintendent would, it is true, continue in charge of the F-1 properties, but the expense and other disadvantages of appointing temporary trustees, previously adverted to, would far outweigh the advantages to be obtained by superseding the Superintendent with temporary trustees for so short a time. Of course there would be no justification for conferring upon the Superintendent, for a period of only one and one-half months, the additional powers proposed in the

plan promulgated by him. If he was able to do without those powers during the entire period of rehabilitation, and if he must continue to do without them until the plan becomes effective, he can likewise forego them for an additional period of about forty-five days.

Undoubtedly a great many certificate holders will be at a loss as to whom to nominate for the office of permanent trustee when they receive nominating blanks, and to add to their difficulties and confusion, it is not unlikely that they will be subjected to electioneering upon behalf of various candidates. It is equally apparent that in numerous instances certificate holders will be confronted with a similar dilemna when called upon to vote upon nominees of whose identity and qualifications they may be utterly ignorant. It may well be that such certificate holders, as well as others, would prefer to leave to the court the selection of one or more of the three permanent trustees to be chosen. The court is confirmed in this belief by reason of the fact that representatives of certificate holders owning certificates of the principal face amount of between ten and fifteen million dollars (representing between one-third and one-half of the total F-1 issue) strenuously urged the court at the hearings upon the plan to appoint temporary trustees of its own selection and expressed their unbounded confidence that the court would exercise this power wisely and properly. Only a reading of the minutes can adequately portray the strength and insistence of the certificate holders' demand that the court appoint its own trustees immediately upon adoption of the plan. In order to enable the certificate holders to express a preference, *if they so desire*, that the court appoint one or more of the three permanent trustees, the Superintendent's plan will be modified so as to provide for the sending out of nominating petitions or blanks in which, in addition to a space for the name of a nominee, there are to be four columns: Column 1, headed " All three trustees to be elected by the certificate holders;" column 2, headed " One of the trustees to be appointed by the court;" column 3, headed " Two of the trustees to be appointed by the court," and column 4, "All three trustees to be appointed by the court."

Each certificate holder will have the right to name one nominee and also to indicate by an appropriate mark in one of the four columns whether he desires all the trustees to be elected by the certificate holders or one or more trustees to be appointed by the court. Even if he expresses a preference that the court appoint three trustees he may also make a nomination which shall be given effect in the event that the majority, in principal amount, of the certificate holders expressing their wishes favor the election of one or more trustees by the certificate holders. For the purpose of

determining the wishes of the certificate holders the totals of the four columns shall be respectively computed, the total of each column to be the aggregate principal amount of certificates held by those expressing their preference in that particular column.

If the total of any one column shall constitute more than half of the total of all four columns, .the preference expressed in that particular column shall be given effect. It may, however, develop that no one of the columns receives such a majority. In that event, if the combined totals of any two or of all three of the columns calling for the appointment of one, two or three trustees by the court shall represent a majority, the court will appoint the minimum number of trustees favored by such majority. For example, if the total of those desiring the appointment of one trustee by the court plus the total of those desiring the court to appoint two trustees is more than half of the total of all four columns, this will indicate that a majority desire the court to appoint *at least* one trustee. In such a situation the court would appoint one trustee and two would be elected by the certificate holders. A detailed statement of the procedure to be followed in each and every possible contingency is to be inserted in the plan to be submitted upon the settlement of the plan and of the order to be entered hereon.

In the event that all three trustees are appointed by the court no election will be necessary and the permanent trustees can be appointed and assume their duties within a few days after the expiration of the twenty-day period for nominations. The twenty-day period for elections would in that event be eliminated and the Superintendent would remain in charge of the affairs of series F-1 for only about three weeks after the effective date of the plan. Only a single nomination may be made by any certificate holder. Only those nominees will be eligible for election who are nominated by holders of certificates totaling, in face amount, at least two per cent of the outstanding F-1 certificates, exclusive of those held by the title company or by the Superintendent as its rehabilitator. (This provision is the same as that contained in the Superintendent's plan.) Only those certificate holders who are registered as such on the books of New York Title and Mortgage Company or of the rehabilitator thereof at the time the court shall make the order declaring the plan in effect shall be eligible to nominate trustees, or to express a preference for the appointment of trustees by the court, or to vote at the election of the original trustees, if any are to be elected. It should be borne in mind that any trustees appointed by the court will be removable at the will of the majority of the certificate holders, with or without cause, in the same manner as trustees who are elected by the certificate holders.

The modification proposed by the court is much fairer to the great body of certificate holders than the plan promulgated by the Superintendent or the modification advocated by the large number of certificate holders who have presented their views at the hearings. The change suggested by the latter would, as previously pointed out, require the great mass of certificate holders to choose between a plan which calls for the court's appointment of three temporary trustees and no plan at all. If the provisions for the appointment of trustees by the court were to prove unacceptable to two-thirds, in principal amount, of the certificate holders they would have no alternative but to disapprove the plan and thus permit the Superintendent of Insurance to remain in control. The modification proposed by the court is open to no such objection. Approval of the plan would not carry with it approval of the appointment of trustees by the court. After the approval of the plan every certificate holder would be entirely free to exercise an untrammeled choice as to the method of selecting the trustees. It would be wholly up to him whether or not to leave the appointment of one or more trustees to the court. The court would not have the right to appoint any trustees unless the certificate holders themselves by their own voluntary act indicated that they wished the court to do so. Although between one-third and one-half, in principal amount, of the F-1 certificate holders, with only a single dissent, have urged the court to submit a plan providing for temporary trustees of its own appointment the court is not going that far, as it well might, but is instead submitting a plan which leaves it entirely to the certificate holders at large to decide for themselves whether they want trustees of their own selection or trustees chosen by the court. This is in keeping with the court's repeated pronouncements that it is for the certificate holders themselves to decide what shall be done with their properties. (*Matter of New York Title & Mortgage Co.*, 150 Misc. 488; *Matter of New York Title & Mortgage Co.*, Id. 89.) The difference between the court's plan and that of the Superintendent of Insurance in this respect is merely that the latter's does not give the certificate holders an opportunity to express a preference for trustees appointed by the court, while the court's plan provides a mechanism for registering such a preference without forcing any certificate holder, in the slightest, to do so.

The Superintendent's plan will accordingly be modified in the following respects:

(1) By increasing the votes required to elect a State agency as sole trustee to two-thirds in principal amount of the outstanding F-1 certificates, exclusive of those held by the New York Title and Mortgage Company or by the Superintendent of Insurance

as its rehabilitator, and by eliminating the provision for cumulative voting in so far as the election of a State agency is concerned.

(2) By shortening the period for nominations to twenty days from the date the Superintendent mails notices to the certificate holders that the plan has taken effect, and by requiring the Superintendent to mail such notices accompanied by nominating blanks within five days after the court has made an order declaring the plan in effect.

(3) By shortening the period for casting votes for nominees, should it be necessary to elect one or more trustees, to twenty days from the date the Superintendent mails to the certificate holders the names of the eligible nominees, accompanied by ballots, and by requiring the Superintendent to mail such names and ballots within five days after the expiration of the period for nominations.

(4) By changing the form of the nominating blanks as previously indicated so as to permit the certificate holders to vote for the proposition that the court appoint one, two or three of the permanent trustees.

(5) By providing for the appointment by the court of one, two or three trustees if the certificate holders express a preference therefor in the manner previously indicated.

(6) By providing that the permanent trustees elected, if any are to be elected, be determined by pluralities of votes cast (this is substantially the same provision as that in the Superintendent's plan).

(7) By eliminating the proposal to confer upon the Superintendent of Insurance " additional limited temporary powers " between the effective date of the plan and the selection of permanent trustees.

(8) By limiting the right to nominate, the right to express a preference in respect to the appointment of trustees, and the right to vote for such original trustees as may be elected, to certificate holders registered as such at the time the court makes an order declaring the plan in effect.

In addition to the foregoing, there are various minor changes which the court deems desirable, some of which have been suggested by certificate holders.

The phraseology of the plan and of the " Declaration of Trust " should be changed wherever necessary in order to carry out and effectuate the various modifications of the plan suggested by the court and previously referred to.

There should be a definite statement in the plan and also in the " Declaration of Trust " excluding certificates held by the New York Title and Mortgage Company or by the Superintendent of Insurance from all voting rights for whatsoever purpose.

Paragraph 3 of the Superintendent's plan, entitled " Transfer of Property," should be replaced by the more comprehensive provisions proposed to be substituted therefor in the schedule of modification submitted by Wagner, Quillinan & Rifkind.

The provisions in the Superintendent's plan regarding the compensation of trustees and also article III of the Declaration of Trust should be further restricted and limited by providing that in no event shall the fees of all three trustees together exceed the statutory commissions payable to a *single* trustee or one-half of one per cent of the total principal amount of the outstanding certificates, *whichever shall be lower*.

Paragraph 7 of the Superintendent's plan should be modified by adding at the end thereof the words, " or by the modification of the terms of any underlying bond and/or mortgage or by the performance of any act hereunder."

Paragraph 8 of the Superintendent's plan should be amended so as to read as follows: " The agency of the New York Title and Mortgage Company to service the underlying mortgages shall cease and terminate upon the qualification of and execution of the Declaration of Trust by the Trustees, unless notice of the termination of such agency shall be required, and in that event upon the date fixed in such notice, and as of that date the Trustees shall undertake the servicing of these mortgages either directly or through their duly authorized agent."

Paragraph 11 of the Superintendent's plan should be amended so as to read as follows: "All expenses connected with the proceeding in this series, under Chapter 745 of the Laws of 1933, as amended, and any action taken thereunder, including the election of Trustees, shall be paid as an expense of the Trust Estate after approval by the court, upon notice to all Certificate Holders. No charges therefor shall be personally assessed against any Certificate Holder, whether consenting to this plan or not."

The recitals contained in the " Declaration of Trust " should be modified by adding after the word " Plan " in the fourth line of page 14 of the printed plan submitted by the Superintendent, the words " as modified by the court."

Subdivision (d) of article I of the " Declaration of Trust " should be amended so as to read as follows: " The term ' Trustees ' shall mean the persons elected as Trustees by the Certificate Holders and/or the persons, if any, appointed by the court as Trustees, pursuant to authority conferred by the Certificate Holders, in accordance with the provisions of the Plan as modified by the court, and their successors in office selected in the manner hereinafter provided for, provided, however, that no person shall be

deemed a Trustee until and unless he shall have duly qualified and accepted this Trust by executing the Declaration of Trust."

Subdivision (d) of article V of the "Declaration of Trust" shall be modified by adding a provision for cumulative voting for trustees to be elected by the certificate holders, except that cumulative voting shall not be allowed, as previously indicated, in voting upon the proposition whether a State agency or authority shall be selected as sole trustee.

Subdivision (a) of article VI shall be amended by inserting after the word " office " in the second sentence thereof, the words " unless sooner removed."

Subdivision (b) of the same article shall be modified by inserting after the word " by " in the second line thereof, the words " a plurality vote of the registered," and by further inserting after the words " certificate holders " in the same sentence, the words " at such time and."

Subdivision (d) of article VI shall be modified by inserting after the words " each and every," the words " original trustee elected or appointed and each and every."

Instead of the second and third sentences of article VII of the " Declaration of Trust," the following language should be substituted: " Beginning in the month of January, 1936, and thereafter contemporaneously with the filing of their account, the Trustees shall submit to the court their plans for operating the Trust Estate and a budget of their estimated income, expenditures and distributions for the calendar year, and give at least twenty days' notice by mail to the certificate holders of the time when the court shall pass upon such plan of operations and budgets."

The fourth sentence of article VII should be amended so as to read as follows: " If at such hearing no objection is made to such plans and budgets, and if the court shall not find them objectionable in any respect, they shall be approved by the court, but if there be objection, then the court shall hear and pass upon the same and either dismiss such objection or direct such modifications of the plans and budgets as the court deems proper. The court may, of its own motion, direct such modifications as it sees fit."

Subdivision (r) of article VIII should be amended by adding after the words " Trust Estate " in the second line of said subdivision, the words " or alter the priority of the lien of any mortgage or other interest in real or personal property constituting part of the Trust Estate, as security therefor."

Subdivision (u) of the same article should be amended so as to read as follows: "Appoint an agent and/or agents to perform any of the duties or functions of the Trustees hereunder which they may

properly delegate, and to remove any such agent or agents so appointed."

Subdivision (v) of the same article should be amended by changing the words " a reasonable fee " to the words " reasonable fees," and by inserting after the word " committee " in the fourth line of the subdivision the words, " and counsel for certificate holders who have rendered services which have proved of value to the certificate holders."

Article VIII should be further modified by adding subdivision w, reading as follows: " To do and perform any other act or acts in connection with any of the properties constituting a part of the Trust Estate, not specifically enumerated herein, whenever the same becomes necessary and is essential to the preservation of the Trust Estate and/or to avoid the loss, destruction or impairment thereof or of any of the properties therein."

The same article should be further amended by adding subdivision x, reading as follows: " To adjust and compromise any debts, dues, claims, demands or choses in action which may now or at any time hereafter constitute part of the Trust Estate, or which are now or shall at any time hereafter become due, owing, payable or deliverable to the Trust Estate."

A further provision should be added to the effect that unless otherwise expressly provided, all applications to the court shall be made upon notice to the certificate holders, given in such manner as the court shall direct.

The paragraph following subdivision (o) of article VIII should be modified so as to make clear that the powers referred to in subdivisions (a) to (o) may be exercised without application to the court, and that all other powers may be availed of only upon an application to the court.

Subdivision (c) of article IX should be amended by substituting for the first sentence thereof the following: "Any one or more of the rights or powers herein vested in the Trustees, may be executed by a majority of them or pursuant to the order of such majority, or, in the event of a tie, then as the court may direct, except in those instances where by law such action must be concurred in by all the Trustees."

Subdivision (a) of article X should be amended by inserting after the words, " Certificate Holders," in the last sentence of that subdivision, the words " or to the committee of an incompetent Certificate Holder or the guardian of an infant Certificate Holder."

Article XI should be amended by substituting the word " January " for the word " July " in the second line of the article, and by providing that the notice referred to in the article shall be given by

mail. The article should be further modified by inserting a provision permitting the court of its own motion to find the account objectionable in any respect, even in the absence of objection on the part of the certificate holders.

Subdivision (a) of article XIII of the " Declaration of Trust " should be amended by adding, " provided, however, that nothing in this Declaration of Trust contained shall exempt any Trustee from liability arising out of his own willful misconduct, bad faith or negligence." Subdivision (h) of article XIII should be eliminated.

The Superintendent's plan will be approved with the modifications indicated and with such other minor modifications as may prove necessary to carry out the plan with the modifications suggested by the court.

Settle order and plan, including the form of the nominating petitions or blanks and of the ballots for the election upon two days' notice within five days from the date hereof.