In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property and Rehabilitate the NEW YORK TITLE AND MORTGAGE COMPANY.

Supreme Court, New York County, December 26, 1934.

*Harry Rodwin* [*A. Kaufman* of counsel], for the Superintendent of Insurance.

*Carter, Ledyard & Milburn* [*J. M. Richardson Lyeth* and *J. P. Allee* of counsel], for the Committee for the Protection of Series Q Mortgage Certificates.

Other parties interested duly appeared as follows:

*John Holley Clark, Jr.*, for the Committee of Inquiry.

*L. & A. U. Zinke* [*Alexander U. Zinke* of counsel], for the Riehl infants and others.

*Joseph M. Ninhauser* [*Arthur G. Solomon* of counsel], for the Levmend Holding Corporation.

*George W. Tucker* and *Noah Feldman*, for the certificate holders.

*Salkin & Korn*, for Julius Levy.

*Russell, Shevlin & Russell* [*Matthew J. Shevlin* of counsel], for the certificate holder James J. Shevlin.

*Allen R. Memhard*, for M. G. Stanley Brown.

*Thomas Keogh*, for Anna P. S. Kelly.

*Cullen & Dykman*, for the Brooklyn Trust Company, as trustee.

*Paul Windels, Corporation Counsel* [*S. S. Rogers* of counsel], for the City Chamberlain.

Numerous other certificates holders attending in person.

FRANKENTHALER, J. This is a proceeding under the Schackno Act (Laws of 1933, chap. 745) for the reorganization and readjustment of the rights of the holders of series Q first mortgage certificates, issued and guaranteed by New York Title and Mortgage Company. On December 31, 1933, there were 3,248 holders of series Q certificates of an aggregate principal amount of $10,205,307.08. The certificates are secured by 847 mortgages in the counties of Queens and Nassau, of which 168 had been foreclosed and 21 others were under foreclosure. Title to most of the foreclosed properties has been taken in the name of Liberdar Holding Corporation or Land Estates. Inc., subsidiaries of New York Title and Mortgage Company.

At the request of a committee representing holders of a substantial portion of series Q certificates the Superintendent of Insurance promulgated a plan calling for the management of the bonds, mortgages and properties of series Q by five specifically-named trustees, to serve until April 1, 1935, and then to be replaced by five trustees elected annually by the certificate holders. During the progress of the hearings held in connection with the application to obtain judicial approval of the plan various modifications of the plan were made by the committee previously referred to. For example, the plan has been altered so as to provide that the court appoint two of the five trustees, and that these two trustees continue in office indefinitely, the requirement of annual elections by the certificate holders applying only to the other three trustees.

Opposition to various provisions of the plan both in its original and its modified form has been expressed by some of the certificate holders. The Superintendent of Insurance, although he himself promulgated the plan, proposed a number of changes and finally disapproved the plan, stating that " since the hearings in this plan we have developed and crystalized a form of trustee plan which should apply to Group Series generally, and, in our opinion, furnishes a comprehensive, adequate and better plan for the protection of the rights of certificate holders. Such a plan has been promulgated in Series F-1 and it is my desire to offer a similar plan, in the form of an amendment, to the Series Q." Consents to the plan with such modifications as the court may make are on file, signed by more than a thousand holders of certificates aggregating in excess of $4,000,000, almost one-half of the principal amount of the outstanding certificates of series Q.

Comparison of the proposed plan, in its modified form, with that recently approved by this court in connection with the reorganization of series F-1 (*Matter of New York Title & Mortgage Co.,* 153 Misc. 858), has convinced the court that the F-1 plan is, in its essential features, preferable to that promulgated for series Q. On the other hand, there are certain provisions of the series Q plan which it is desirable to retain, and there are also a number of provisions of the F-1 plan which are not adapted to the somewhat different problems presented by series Q and which should, therefore, be omitted from a plan of reorganization intended for that series.

In passing upon the F-1 plan the court indicated that it did not approve the submission to the certificate holders of a plan which provided for the appointment of temporary trustees by the court and thereby offered the certificate holders " the choice of accepting a plan embodying such a provision or else obtaining no plan at all." For similar reasons the court is opposed to setting before the certificate holders of series Q a plan which provides for three trustees named by a committee in whose selection the majority of the certificate holders have had no choice, and two appointed by the court, thus giving the great body of certificate holders of series Q the alternative of assenting to such a plan or having to go without any plan at all. *In the court's opinion it should be left to the certificate holders themselves to decide who they wish their trustees to be, and whether they wish any of the trustees to be appointed by the court. As this court has repeatedly pointed out, it is for the certificate holders themselves to decide what shall be done with their properties.* The certificate holders should be left entirely free to exercise an untramelled choice as to the method of selecting the trustees who

are to manage their properties. The provisions of the F-1 plan, as modified by the court, enable the certificate holders to effectuate their own desires in this respect and, are, therefore, fairer to the certificate holders than the plan promulgated in the present proceeding.

The requirement that three of the trustees be elected annually is one which, besides appearing to be unnecessary, has serious disadvantages. If new trustees are elected each year there are likely to be constant breaks in the continuity of the management of the series Q affairs, not to mention the fact that each new trustee will hardly have time to acquaint himself thoroughly with the status and problems of the series Q properties and mortgages when he will have to make way for his successor who will be obliged to repeat the process. The proposal that there be five trustees also seems to be inadvisable. Three trustees appear to be ample. The more trustees there are the greater the expense of administration and the less centralized responsibility. With five trustees the time spent in preliminary consideration of each step to be taken or act to be performed by the trustees will necessarily be greater than with only three trustees. Moreover, the larger the number of trustees the greater the practical difficulty of obtaining the concurrence of a majority. With 847 properties and mortgages to administer it is evident that these considerations are especially important. The requirement that each trustee be a certificate holder does not appear to be a good one. The certificate holders might be unduly hampered in their efforts to obtain the most qualified trustees if their choice were restricted to fellow certificate holders. They should be free to choose the most competent men available, regardless of whether or not the latter own series Q certificates. The provision of the F-1 plan permitting termination of the trust by the holders of two-thirds in principal amount of the certificates *with the approval of the court* is preferable to the provision of the modified Q plan which omits the requirement of judicial approval. The Q plan contains no provision for the amendment of the trust indenture. Provision should be made for the termination of the trust on January 1, 1945, in the absence of an earlier termination by the certificate holders with the court's approval. A provision, such as that in the F-1 plan, permitting an amendment to the " Declaration of Trust " by two-thirds in principal amount of the certificate holders with the court's approval is desirable. The provisions of the Q plan in regard to the trustees' immunity from liability are entirely too broad. The language of the F-1 plan which pertains to this subject should be substituted. The F-1 plan is also superior to the Q plan in other respects too numerous to set forth in detail here.

The court is, therefore, of the opinion that the plan promulgated for series Q, in its modified form, should be further modified so as to embody the essential features of the F-1 plan as modified and approved by the court.

As previously indicated, however, there are a number of provisions of the Q plan which might be retained. The plan contemplates that the trustees will agree to pay out of available funds the face amount of the series Q mortgage certificates on or before January 1, 1945, with interest on the unpaid face amount at the rate of four per cent per annum. The attorneys who drafted the Q plan take the position that these provisions are desirable for the purpose of minimizing taxes payable by the trustees. The court sees no reason why this feature of the Q plan should not be permitted to remain. However, the court perceives no justification for limiting the interest to be paid to certificate holders to four per cent per annum. Although this may be the amount of return estimated by the committee, it is quite possible that the yield will, in time, equal the certificate rate of five and one-half per cent. The plan should, therefore, provide that the rate of interest to be paid should be not less than four per cent and not more than five and one-half per cent, in the discretion of the trustees. The provision for the issuance of " beneficial certificates " entitling holders of series Q mortgage certificates to share in any surplus after the payment of the face amount of the mortgage certificates with interest thereon may also be retained. The Q plan provides that " if sufficient funds shall not be available for the payment of any installment of interest, the Trustees shall apply all funds available therefor to a payment on account of such interest installment, and the time of payment of the balance of such installment shall be extended to January 1, 1945, and no interest shall accumulate on such balance." This provision should be modified so as to provide that the deficiency in interest, paid shall be computed on the difference between the rate actually paid and the certificate rate of five and one-half per cent per annum, and that payment of such deficiency may be deferred to not later than January 1, 1945, in the discretion of the trustees. The word " available," as used in the Q plan, is entirely too indefinite. It should be specifically defined in the plan and in the indenture. Otherwise serious questions may arise as to its meaning and considerable litigation may result. Some provision should be made permitting the trustees to retain adequate reserves for the administration of the series Q properties and mortgages. The requirement that interest in excess of four per cent collected by the trustees be distributed to certificate holders in reduction of the face amount of their certificates should be eliminated.

The provision of the modified F-1 plan for the annual presentation to the court of a budget of the trustees' contemplated activities and expenditures for the ensuing year should not be incorporated into the plan to be submitted to the series Q certificate holders. There are 847 bonds and mortgages and properties in series Q and only 121 in series F-1. The character of the series Q properties is also very different from those comprising series F-1. The task of preparing an annual budget for the 847 properties and mortgages of series Q might necessitate the expenditure of a tremendous amount of time by the trustees, and it might carry with it considerable additional expense. It is, moreover, questionable whether such a budget could be prepared by the trustees with any degree of accuracy. There would be a tendency for the trustees in making up a budget for the following year to overestimate rather than underestimate the expenditures to be made and this might well lead to the making of greater expenditures than would be made in the absence of a budget. The court agrees with the objections to the budget interposed by various certificate holders, and no provision for a budget will, therefore, be contained in the modified plan.

To compensate for the omission of a requirement for the filing of annual budgets the committee has suggested that the trustees' accountings be filed semi-annually rather than annually, so that the certificate holders may have a closer check on the activities of the trustees. The provision for semi-annual accountings is approved by the court.

The Q plan confers very extensive powers upon the trustees without a requirement that the exercise of any of these powers be subject to the approval of the court. The provisions of the F-1 plan in this respect are greatly to be preferred. Many of the powers conferred upon the trustees in the F-1 plan may be exercised without court approval, but a number of more important powers require such approval. The modified plan to be submitted to the series Q certificate holders is to be modeled upon the F-1 plan in respect to the powers conferred upon the trustees and the manner in which they are to be exercised. The requirement that judicial approval be obtained before reducing interest will, however, be altered so as to require such approval only where the interest rate is reduced to less than four and one-half per cent per annum. The provision that the trustees may not change or defer the date of payment of interest without the court's approval will be modified so as to require such approval only if the date is deferred or extended for more than three years.

The series Q plan, promulgated by the Superintendent, with the modifications proposed by the committee of certificate holders, is

accordingly further modified by the court so as to embody the essential features of the F-1 plan (as approved by the court). However, those portious of the series Q plan which the court has expressly indicated should be retained will be permitted to remain in the plan to be submitted to the series Q certificate holders. Other than these, no provisions of the Q plan which are in conflict or inconsistent with any of the provisions of the F-1 plan are to be retained. Settle order and plan on five days' notice.