In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property and Rehabilitate the NEW YORK TITLE AND MORTGAGE COMPANY.

Supreme Court, New York County, February 7, 1935.

*Harry Rodwin* [*A. Kaufman* and *Julius Sucher* of counsel], for the Superintendent of Insurance.

*James N. Rosenberg*, for D. H. Nathanson.

*Weiss, Pels & Grant* [*Julius Weiss* of counsel], for the sponsoring committee for protection of certificate holders.

*N. Samuel Coan*, for G. H. Coan.

*Frank A. Kister*, for August Danger.

*H. Edward Vollners*, for M. Vollners.

*A. A. Silberberg*, for I. Rosenfeld.

*Kuzman & Frank*, for H. K. Greenwald and another.

*Gleason, McLanahan, Merritt & Ingraham*, for the estate of Louis Siegbert.

*H. A. Stahl*, for the Tribune Fresh Air Fund.

Numerous other certificate holders appearing in person.

FRANKENTHALER, J. This is a proceeding, under the Schackno Act (Laws of 1933, chap. 745), for the reorganization of series BX-19, which consists of certificates issued and guaranteed by New York Title and Mortgage Company, representing " participatory interests " in a single first mortgage of a present unpaid principal amount of $997,500. The cash collateral available for payment of principal amounts to $2,600. The outstanding certificates, exclusive of those held by the New York Title and Mortgage Company, aggregate, in principal amount, $999,364.60. There are 446 certificate holders.

The principal amount of the mortgage, at the time of its execution in March, 1929, was $1,050,000. The property was appraised at $1,600,000 in November of the same year. In May, 1932, the title was acquired by Liberdar Holding Corporation, a wholly owned subsidiary of New York Title and Mortgage Company, as the result of a foreclosure action commenced by the title company by reason of a default under the mortgage. The Liberdar Company operated the property until August 18, 1933, on which date the United States District Court for the Southern District of New York appointed equity receivers for the company, one of them a Deputy Superintendent of Insurance, on an application consented to, if not initiated, by the Superintendent of Insurance, as rehabilitator of New York Title and Mortgage Company. Admittedly, the equity receivership application for the Liberdar Company had the active co-operation of the Insurance Department. The receivers have been in charge of the property from the time of their appointment.

The mortgaged property is a six-story and basement elevator apartment building at 2720 Grand Concourse, borough of The Bronx, built on a plot whose dimensions are 215 feet, 244.39 feet, 227.57 feet and 225.65 feet, respectively. It consists of 164 apartments containing 677 rooms. The building is only six years old and in very good condition. During the period from September 20, 1933, to September 30, 1934, the gross income, on a cash basis, amounted to $134,939.07. Operating expenses, *including a management fee of $4,676*, were $44,114.12, leaving $90,824.95 available for taxes, water charges and interest on the mortgage. Out of this fund the Liberdar receivers paid taxes for two entire years (both halves of 1933 and 1934), as well as all water charges. *In addition, they paid penalties for delayed payment of taxes aggregating $2,730.39.* The total paid for taxes, penalties and water charges was $54,845.29. Out of the remaining $35,979.66, the receivers paid to the Superintendent of Insurance, as rehabilitator of the title company, the sum of $27,438.47 on account of interest due on the mortgage, *and retained $6,684.11* (five per cent of their gross collections) *as a*

*reserve for payment of receivers' charges* (Superintendent's Exhibit 10, Schedule C). This left $1,857.08 in the receivers' hands, in addition to $7,306.59, the amount in their possession on September 20, 1933, the beginning of the period. Out of the $27,438.47 paid by the receivers to the Superintendent of Insurance on account of interest, *the Superintendent withheld $4,823.64 (one-half of one per cent of the outstanding principal) as a reserve for servicing charges,* and paid $22,403.60 to certificate holders on account of interest which became due May 1, 1933, and November 1, 1933.

Taxes and water charges for the year 1934 were $28,807.50. Had there been no arrears of taxes and water charges to pay and no penalties for delayed payment of taxes, the amount available for the payment of interest on the mortgage would have been $62,017.45 ($90,824.95, less $28,807.50), which represents a return of more than six per cent per annum on the principal amount of the mortgage, after payment of the management fee of $4,676. (The management fee was included in the operating expenses of $44,114.12 deducted from the gross income in arriving at the figure of $90,824.95.) Even if a receivers' charge of five per cent of the collections and the Superintendent's servicing fee of one-half of one per cent of the outstanding principal are deducted, in addition to the management fee (the propriety of these deductions will be discussed presently), there would be $50,509.70 available for the payment of interest, *sufficient to pay more than five per cent per annum to certificate holders.* It is true that these figures cover a period of ten days more than a year. The ten-day difference involved is, however, so slight that for all practical purposes it may be disregarded. The Superintendent of Insurance has prepared a statement of operations for the *year* ending September 30, 1934, on an "annual accrual basis." This statement shows $58,612.17 as being available for interest, which is equivalent to almost five and nine-tenths per cent. (Superintendent's Exhibit 10, Schedule A.)

An appraiser employed by the Superintendent of Insurance inspected the property on November 26, 1934. According to his estimate, the amount available for interest annually should be $50,932.50, which is equivalent to more than five and one-tenth per cent on the principal amount of the mortgage. Moreover, this figure is arrived at after deducting $6,000 for *capital* expenditures, which is not a permanent annual recurring charge. Besides, the estimate is based on a gross annual income of only $127,156, which is over $3,000 less than the actual gross income received during the past year. On the basis of his estimate, the appraiser has valued the property at $950,000.

The statements of operations offered in evidence by the Superintendent of Insurance have met with severe criticism at the hands of counsel for the various certificate holders. Penalties of $2,730.39 were permitted to accrue in respect to taxes, although the receivers admittedly had sufficient funds on hand to pay the taxes and avoid the penalties. Their right to pay the taxes was clear. (*Prudential Ins. Co. v. Liberdar Holding Corp.*, 72 F. [2d] 395; *Prudential Ins. Co. v. Liberdar Holding Corp.*, 74 id. 50.) There was no justification for their refusal to pay the taxes until ordered to do so by the Federal court. The receivers were appointed, as heretofore stated, with at least the consent and co-operation of the Superintendent of Insurance as rehabilitator of New York Title and Mortgage Company. One of the receivers is a Deputy Superintendent of Insurance. The receivership has been vigorously attacked by certificate holders on the ground that it was wholly unnecessary and merely increased the expenses of operation, thereby reducing the income available to certificate holders. Attention has been called to the fact that the rehabilitation of Lawyers Mortgage Company and other guaranty companies has been proceeding without a receivership of their wholly owned subsidiaries. Insufficient facts are before the court in the present proceeding to enable it to determine whether this criticism is well founded. However, whatever may be said as to the necessity for the receivership itself, it appears to be clear that the Insurance Department must accept some responsibility for the failure of its own Deputy (as receiver of Liberdar Holding Corporation) to pay taxes until substantial penalties had accrued, although funds sufficient to pay the taxes were concededly available. The Superintendent's deduction of a reserve for servicing fee of $4,823.64, representing one-half of one per cent of the principal amount of the mortgage, also seems to be unwarranted. The property was managed during the period in question by the receivers, and not by the Superintendent. The latter, outside of accepting interest payments from the receivers, did virtually nothing in the way of servicing. The agents who actually managed the property had already received $4,676 as a management fee. In addition to that, the receivers, who did nothing more than supervise the work of the agents, had retained $6,684.11 as a reserve for their expenses. The order permitting the retention of this reserve was made upon the consent of the Superintendent of Insurance. *The total charges or reserves for management are thus brought up to $16,183.75, almost twelve and one-half per cent of the gross income and about thirty-three and one-third per cent of the net income of the property.*

This situation of charges piled upon charges and penalties for delayed payment of taxes, which could, to some extent, have been avoided, is by no means unusual in the rehabilitation of the title companies. Indeed, it appears to repeat itself in issue after issue of mortgage certificates. In one issue (Series Q2) it developed that the following charges were deducted from the income of the property, amounting to $57,855.50, between September 30, 1933, and September 30, 1934: A fee of $2,803.88 to the agents managing the property (five per cent of the gross rents); $553.75 as commissions to the agents upon new leases; a reserve of $5,593.09 for the Liberdar receivers, *representing ten per cent of the gross rents* (this ten per cent reserve was retained without a formal order of the Federal court); a reserve of $1,500.01 for the servicing charges of the Superintendent of Insurance as rehabilitator, up to August 1, 1934, and a servicing fee of $336.66 to the Servicing Corporation of New York for the servicing of the mortgage during August and September, 1934. In addition to the $1,500.01 above referred to, the Superintendent intends to deduct a further $497.55 to bring the reserve for his service charges for the year ending August 1, 1934, up to $1,997.56, that being one-half of one per cent of the principal of the mortgage. *This reserve is being deducted from the income available to certificate holders although the Superintendent received no moneys whatsoever during the year in question and paid nothing to the certificate holders.* The various charges aggregate about nineteen per cent of the gross income of the property and a much larger percentage of the net income. In another issue (Series A-1) the number of charges upon charges is even larger, viz.: (1) Commissions to a managing agent in charge of the property; (2) *commissions to the Nyamco Company, a wholly owned subsidiary of the title company, for " supervising " the operation of the property by the managing agent;* (3) a reserve of five per cent of the gross rents for the charges of the receivers of the Liberdar Company which holds title to the property, and (4) a reserve of one-half of one per cent of the principal of the mortgage for the servicing fee of the Superintendent of Insurance. For the period beginning August 1, 1934, a similar charge of one-half of one per cent has been deducted to meet the servicing fee of the Servicing Corporation of New York, recently reduced by one-eighth of one per cent. In a third issue (Series H-92) a similar situation is presented. The following charges are being deducted from the gross income of the property before any moneys become available to the certificate holders: (1) The fee of the managing agent in charge of the property; (2) commissions to the managing agent on leases; (3) an " over-riding " fee to the Nyamco Company for " supervising " the work of the managing agents; (4) a reserve of

five per cent for the charges of the receivers of the Liberdar Company; (5) a reserve of one-half of one per cent of the principal amount of the mortgage for servicing charges of the Superintendent of Insurance as rehabilitator. From August 1, 1934, the Servicing Corporation of New York has been receiving a similar amount as its servicing fee, since fixed at three-eighths of one per cent.

Recently, as the result of persistent urging, the Insurance Department has obtained assignments of rents from the receivers of the Liberdar Company, thus eliminating the five per cent reserve for receivers' charges. Had such assignments of rents been obtained earlier the certificate holders would have been saved the greater part of the receivers' charges which they must now bear. The Insurance Department was entitled to such assignments in every case where the owners of the properties (or the receivers of the owners) were in default, except where the only default was as to principal. As to the deduction of one-half of one per cent of the principal of each mortgage as the " servicing " fee of the Superintendent of Insurance, the claim is repeatedly made that this represents only a reserve, and that the actual fee, when ultimately fixed, may be considerably less. However, although rehabilitation has been in progress for about eighteen months, no effort has as yet been made to have the actual servicing fee fixed and determined. In view of the fact that the Superintendent ceased to charge a servicing fee for himself as of August 1, 1934 (the servicing, from that time on, being done by the Servicing Corporation of New York), the delay in having the servicing fee determined is difficult to understand. The result of this delay is that the difference between the amount of the reserve and the servicing fee as ultimately fixed is being kept intact without serving any useful purpose, instead of being applied (1) to the prompt payment of taxes, thus avoiding heavy penalties, and (2) to interest for certificate holders. Even when funds have been available for the payment of taxes, there have been long delays in making the payments, which have added large penalties to the already onerous charges which the certificate holders must bear. It is not surprising, therefore, that certificate holders are repeatedly asking why the equity receiverships of the Liberdar Company and of the Land Estates, Inc.— the applications for which they claim were ill-advised and unjustified — are not terminated.

The proposed plan of reorganization for series BX-19 is dated October 8, 1934. The notice of application for judicial approval of the plan was served October 30, 1934, and was made returnable December 11, 1934. At the hearing on the last-mentioned date, counsel for the Superintendent announced that the receivers of the

Liberdar Holding Corporation had executed an assignment of the rents of the mortgaged property to the Superintendent of Insurance, as rehabilitator of New York Title and Mortgage Company, orders directing assignments of rents having been made by the Federal court. This means that the income of the property will hereafter be paid directly to the rehabilitator without passing through the hands of the receivers, thus eliminating the receivers' charges. During the hearings counsel for the certificate holders strenuously urged that the Superintendent should obtain a deed to the property from the receivers without being compelled to institute a foreclosure action in order to acquire the title. The court is informed that negotiations to obtain a deed have been successful and that the Federal court has indicated its intention to sign an order permitting the receivers to make the conveyance.

The plan of reorganization promulgated herein is substantially identical with those promulgated in connection with the reorganizations of series F and series F-1. (*Matter of New York Title & Mortgage Co.*, 153 Misc. 858; *Matter of New York Title & Mortgage Co.*, 154 id. 214.) Various objections to the plan have been interposed on behalf of certificate holders. One of the principal objections relates to the compensation of the trustees. The plan calls for three trustees and provides that they are to waive the right to statutory commissions and to be paid such compensation as the court may fix, which is not to exceed the statutory commissions. The claim has been made on behalf of certificate holders that this might permit triple commissions on principal (one for each trustee) in the event of a sale of the mortgaged property by the trustees. In connection with the reorganization of series F-1, the court in its order fixed the maximum annual compensation of the trustees at one-fourth of one per cent of the principal amount of the outstanding certificates, to be divided among the three trustees in accordance with the results achieved and the time spent by each of them, and further provided that the trustees were to receive no other compensation. The court is of the opinion that the maximum aggregate compensation in the instant case should also be fixed at one-fourth of one per cent of the principal amount of the outstanding certificates and that this should be the only compensation payable for trustee services. It should be borne in mind that the mortgaged property consists of a single building and that it is contemplated that managing agents will be employed to take charge of the actual operation of the premises.

The court also believes that the proposal that there be three trustees is not a good one for series BX-19. One trustee will be sufficient, there being only a single building to administer. No

useful purpose can be served by having three trustees. Moreover, in view of the fact that the court has limited the maximum annual compensation to one-fourth of one per cent of the principal amount of the outstanding certificates, a division of that compensation among three trustees would have the effect of giving each trustee so small a sum as to practically destroy all monetary incentive for devoting a substantial amount of time and effort to the duties of the trusteeship. The plan will be modified by providing that there shall be only one trustee.

The proposed plan is also open to criticism in connection with the exculpatory provisions which exonerate the trustees from all liability so long as they act in good faith. The court has already modified other plans (series F, series F-1 and series Q) by inserting in each of them a provision that the trustees shall not be immune from liability in cases where they are negligent as well as in cases where they act in bad faith. The exculpatory clauses of the plan for series BX-19 should be modified accordingly.

It is unnecessary to take up in detail each and every feature of the proposed plan. For the reasons indicated in modifying the plan promulgated for series F-1, the present plan will be modified in the same way so that both plans will be identical except for such changes as may be necessary because of the fact that there is to be only one trustee for the present series.

On September 30, 1934, the receivers of Liberdar Holding Corporation had in their possession a balance of $9,163.67, exclusive of the reserve of $6,684.11 which they retained as previously stated. This reserve should be more than ample to pay the receivers' charges. In *Prudential Ins. Co.* v. *Liberdar Holding Corp.* (72 F. [2d] 395, 399) the Circuit Court of Appeals for this circuit declared that the receivers' allowance " should not * * * be greater than what the same care would have cost, had the petitioner [the Superintendent of Insurance, as rehabilitator of the title company] been in possession." The Superintendent's *maximum* charge would have been $4,823.64 (one-half of one per cent of the principal). Counsel for the Superintendent has himself stated during the hearings that " a reading of the opinion of the Circuit Court of Appeals leads me to the belief that five per cent is grossly excessive." Taking into consideration the fact that the receivers admittedly agreed to serve without compensation and that they were appointed by the Federal court on that understanding, it is not unlikely that the allowance ultimately made to the receivers by the Federal court will be considerably less than the five per cent reserved by them. The trustee to be selected or appointed (the method of selection is to be determined by vote of the certificate holders)

immediately upon his qualification may take appropriate steps to compel the receivers to pay over the moneys in their possession, less their proper charges, so that the funds may be made available to the certificate holders.

Settle order and plan upon three days' notice.